**WILLIFORD ENERGY COMPANY, An Oklahoma Corporation, Appellant,**

v.

**SUBMERGIBLE CABLE SERVICES, INC., An Oklahoma Corporation; Reda Pump Division, TRW Energy Products Group of TRW, Inc., An Ohio Corporation, Appellees.**

No. 07–93–0307–CV.

Court of Appeals of Texas, Amarillo.

Oct. 11, 1994.

Baker & Botts, Bob E. Shannon, Austin, Holliman, Langholz, Runnels & Dorwart, Richard J. Cipolla, Jr., Tulsa, OK, for appellant.

Waters, Holt & Fields, David E. Holt, Pampa, Gibson, Ochsner & Adkins, Wayne P. Sturdivant, Kathryn R. Wray, Amarillo, for appellees.

Before REYNOLDS, C.J., and DODSON and BOYD, JJ.

BOYD, Justice.

In seven points of asserted error, appellant Williford Energy Co. (Williford) challenges the trial court's rendition of a take-nothing judgment after a bench trial. In the suit in which this judgment was rendered, Williford sought recovery against Submergible Cable Services, Inc. (Submergible) and Reda Pump Division, TRW Energy Products Group of TRW, Inc. (Reda) for an alleged breach of contract and negligence. We affirm the judgment of the trial court.

In July 1986, the Sell (Upper Morrow) Unit was created in Lipscomb and Ochiltree Counties under chapter 101 of the Texas Natural Resources Code Annotated (Vernon 1993). Williford was named as the unit operator. The unit was formed for the purpose of conducting a waterflood secondary recovery project in the Morrow formation. The Sell 9–1, the well which is at the center of this controversy, was in existence when this unit was formed.

In late 1986, Williford decided to use an artificial lifting system to raise the oil from the well. It chose to use an electric submersible pumping system (ESP) manufactured by Reda. This type of pump is designed to be lowered to a point near the bottom of the wellbore where it operates to pump petroleum to the surface. Williford provided Reda with the specifications of the Sell 9–1 well and Reda's sales representative, Fred Robbins, selected the specific components to be used.

As relevant here, the components of the ESP that Williford purchased from Reda were an electric motor, a centrifugal pump, and a three conductor electric cable armored in a steel casing. Proper installation of the ESP requires that the pump be attached to the top of the motor. In turn, the pump and motor must be attached to production tubing which is used to lower the pump and motor into the well casing and serves as a conduit for the oil being pumped by the system.

In order for the electric motor to operate the pump, the armored electric cable has to be connected to the motor. The cable must then be secured to the tubing so that it does not interfere with the lowering of the system into, or removal from, the well casing. Stainless steel bands, which encircle both the tubing and the cable, are used to secure the cable to the tubing. The bands must be drawn tight and securely crimped to serve their intended purpose.

On January 23, 1987, Williford removed a full-gauge packer, or plug, that had been placed just above perforations in the casing at a depth of 8,160 feet. The down-hole ESP equipment was installed on January 24, 1987. One of Reda's employees, Ray Browning, was present during much of the ESP's installation.

Williford purchased the steel bands to secure the cable to the tubing from appellee Submergible Cable Services, Inc. (Submergible). Williford also hired Submergible to install the bands and rented their banding guns and a hydraulic spooler (to handle the cable) in order to complete the job. Brad Ralstin, one of Submergible's employees, performed the installation. There were no problems reported in installing the ESP system.

The Reda ESP system operated properly until approximately January 15, 1988. The parties agree that the one year that the ESP system operated was within the system's ex-

pected operating life. On January 18, 1988, Williford began operations to remove the down-hole ESP equipment for repair or replacement and hired Reda, represented by Browning, and Submergible, represented by Ralstin, to assist in removing the equipment.

After removing fifteen stands of tubing, or approximately 930 feet, the cable began slipping from the tubing and, as a result, failed to come out of the casing at the same rate as the tubing. After discussing alternatives with each of the appellees' representatives, Williford attempted to resecure the cable to the tubing and proceeded to remove two more stands. At this point, however, the cable completely ceased coming out of the casing with the tubing. Williford removed an additional one and one-half stands of tubing before the tubing became stuck in the casing.

Next, Williford unsuccessfully attempted to loosen the tubing by lowering it and the pump assembly back down the well. Believing that the pump was the most likely cause of the problem, Williford cut the pump free from the tubing. This attempt to remove the remaining tubing and cable was also unsuccessful. Williford next conducted a free-point test to determine the location of the obstruction in the casing. This test revealed that there was an obstruction at approximately 2,300 feet. Williford cut the tubing just above this obstruction and removed the tubing above that point. It then began a "fishing" operation to remove the remaining cable and tubing. This operation was successful in removing all of the tubing and approximately 2,000 feet of the cable; however, the down-hole components of the ESP and the remaining cable were not recovered. As a result of the obstruction created by the remaining cable, Williford plugged the well.

Williford brought suit against Reda and Submergible for negligence and breach of contract. In its suit, Williford alleged that Submergible failed to properly install the bands securing the electrical cable to the tubing, which resulted in Williford's inability to remove the ESP system and the ultimate loss of the Sell 9–1 well. Williford also claimed that Reda was responsible for the loss of the well because, as a part of its contract with Williford for the installation of the ESP system, Reda was responsible for insuring the proper installation of all the components of the ESP system, including the bands securing the cable to the tubing. Williford argued that Reda's responsibility extended to the attachment of the bands because if the cable were not properly installed, the ESP system would not properly perform its intended functions. At the close of Williford's evidence in the bench trial, the court granted Reda's motion for judgment. Subsequently, the trial court rendered a take-nothing judgment in favor of Submergible. Hence, this appeal.

Williford's first point of error alleges that the trial court erred in granting Reda's motion for judgment because the findings of fact upon which this action was based are contrary to the great weight and preponderance of the evidence or, alternatively, are not supported by sufficient evidence.

It is well established that the trial court's findings of fact are reviewable by the same standards that are applied in reviewing the evidence supporting a jury's answers. With regard to a factual insufficiency challenge, we are required to examine the entire record to determine whether there is some probative evidence to support the finding and, if there is, we must determine whether the evidence supporting the finding is so weak or the answer so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951); *Hydrocarbon Management, Inc. v. Tracker Exploration, Inc.*, 861 S.W.2d 427, 431–32 (Tex.App.—Amarillo 1993, no writ); *Raw Hide Oil & Gas Inc. v. Maxus Exploration Co.*, 766 S.W.2d 264, 276 (Tex.App.—Amarillo 1988, writ denied).

■ Parenthetically, we note that several of the findings of fact Williford challenges are findings in which the trial court found that Williford "failed to prove" certain elements. Such a negative answer means that the party with the burden of proof has failed to carry that burden. *Ice Bros., Inc. v. Bannowsky*, 840 S.W.2d 57, 60 (Tex.App.—El Paso 1992, no writ). In such instances, the

appellate challenge may be that the matter was established as a matter of law, or that the court's finding was against the great weight and preponderance of the evidence. *Croucher v. Croucher,* 660 S.W.2d 55, 58 (Tex.1983). In this case, the challenge being the latter, we must determine if the trial court's finding that Williford failed to establish certain elements of its cause of action was against the great weight and preponderance of the evidence.

In argument under this point, Williford specifically challenges findings of fact no. 3, in which the court found that Reda did not expressly, or impliedly, contract to supervise the installation of the stainless steel bands securing the electric cable to the production tubing on the Sell 9–1; finding no. 4, in which the court found that Reda did not expressly, or impliedly, contract to supervise the installation of the submergible ESP system in the Sell 9–1; no. 6, in which the court found Submergible properly installed the bands; no. 7, in which the court found the bands were installed by Submergible and Reda did not have a right to, or exercise, any control over Submergible; no. 8, in which the court found the bands were not negligently installed and their installation was not a proximate cause of the loss of the Sell 9–1; no. 9, in which the court found Williford failed to prove that the bands were negligently installed; no. 10, in which the court found Williford failed to prove that the installation of the bands was a proximate cause of any damage; no. 11, in which the court found Williford failed to prove that Reda or Submergible breached any duty owed to Williford; no. 12, in which the court found Williford failed to prove that Reda or Submergible breached any contract they may have had with Williford; and, no. 13, in which the court found neither Reda or Submergible failed to use ordinary care in installing the ESP system in the Sell 9–1.

Williford does not challenge the trial court's finding of fact no. 1 in which it found Reda did not contract with Williford for the stainless steel bands used to secure the electrical cable to the tubing string. Nor does Williford challenge finding of fact no. 2, in which the court found Reda did not contract

to install the steel bands, or finding of fact no. 5 that Reda did not install the bands. Rather, Williford's contractual claims against Reda are based upon the proposition that Reda was obligated to supervise the installation of the steel bands and the down-hole components of the system.

■ A binding contract must have an offer and an acceptance and the offer must be accepted in strict compliance with its terms. The parties must have a meeting of the minds and each must communicate his consent to the terms of the agreement. An implied contract arises from the conduct of the parties, such conduct demonstrating that the minds of the parties met on the terms of the contract without any legally expressed agreement thereto. *Smith v. Renz,* 840 S.W.2d 702, 704 (Tex.App.—Corpus Christi 1992, writ denied). A court, however, cannot enforce a contract unless it can determine what the contract is. It is not enough that the parties think they have made a contract, they must have also expressed their intentions in a manner that is capable of understanding. *T.O. Stanley Boot Co., Inc. v. Bank of El Paso,* 847 S.W.2d 218, 221 (Tex. 1992); *Bendalin v. Delgado,* 406 S.W.2d 897, 899 (Tex.1966).

■ It is undisputed that Williford's vice president of operations, Paul Storts, contracted with Fred Robbins (Robbins), Reda's sales representative, to purchase the ESP equipment manufactured by Reda. Storts testified that he did not discuss with Robbins the purchase of Reda's installation or field services.

Robbins testified that he furnished the price quote for the items Williford purchased from Reda. He explained that the quote was only for the down-hole equipment and did not cover any field services, materials or equipment. Ray Browning (Browning), an employee of Reda, testified that he worked with the rig operator and Submergible's employee, Brad Ralstin, in running the down-hole equipment into the well. He also testified that he had been hired for the installation of the ESP system without specification as to what that entailed. Reda provided Williford with a field sales order and invoice for 13.5 hours of labor at the Sell 9–1 well on January

24, 1987, the day the down-hole ESP equipment was installed.[1]

Williford's field superintendent, Leonard Milburn, testified that he expected Reda to be in control of installing the down-hole ESP equipment because "we bought the equipment from them and hired them to run it in the [Sell] 9–1." He also testified, however, that he hired Submergible to spool and band the cable going into the hole and that he hired other subcontractors, including the power company, electricians, and the well service unit, to do work on the Sell 9–1. Browning testified that he did not believe Williford hired him to band or supervise the banding of the cable.

No evidence was introduced during the bench trial to indicate that either party had expressly stated the extent of Reda's obligations concerning the installation of the ESP system or to oversee the installation of the steel bands. Nor was there any evidence admitted demonstrating that there was a meeting of the minds on this obligation. Under this record, we cannot agree that the trial court's findings that Reda did not expressly contract to supervise the installation of the bands was against the overwhelming weight and great preponderance of the evidence.

■ With regard to the question of whether an implied contract to supervise existed, it is the rule that a contract implied in fact results when the conduct of the parties indicate a mutual intention to contract. *Preston Farm & Ranch Supply, Inc. v. Bio–Zyme Enterprises*, 625 S.W.2d 295, 298 (Tex.1981); *Board of County Com'rs of County of Beaver Okl. v. Amarillo Hosp. Dist.*, 835 S.W.2d 115, 125 (Tex.App.—Amarillo 1992, no writ). We must look to the conduct of the parties to determine the terms of the contract on which the minds of the parties met. *Smith*, 840 S.W.2d at 704.

■ The record reveals that Browning assembled the down-hole components of the pump, attached the electric cable to the motor, and banded the section of the cable along the motor and pump to the tubing. Ralstin,

Submergible's employee, then began banding the cable to the tubing as the rig crew[2] added stands of tubing and lowered the assembly into the well. While Ralstin was banding the cable to the tubing, Browning, at Milburn's request, left the Sell 9–1 to check on a problem at another well in the field. The trial court was free to consider this conduct as indicating that there was no meeting of the minds between Browning, as Reda's agent, and Milburn, as Williford's agent, that Reda was to supervise Submergible's banding operation.

In sum, we do not find that the record demonstrates that the trial court's findings of fact nos. 3 and 4, that Reda did not expressly or impliedly agree or contract to supervise the installation of the steel bands used to secure the cable to the tubing or the installation of the submergible down-hole system, are so against the overwhelming weight of the evidence as to be manifestly unjust.

■ We must next consider the evidence bearing on Williford's theory that it was entitled to recover in tort against Reda. To sustain a cause of action for negligence, it is necessary to show the existence of a duty of one party to another, a breach of that duty, and damages which were proximately caused by the breach. *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex.1987); *Rosas v. Buddies Food Store*, 518 S.W.2d 534, 536 (Tex.1975). Duty is the obligation to conform to a particular standard of conduct toward another, *Castillo v. Sears, Roebuck & Co.*, 663 S.W.2d 60, 64 (Tex.App.—San Antonio 1983, writ ref'd n.r.e.), and is the threshold inquiry in a negligence case, *Graff v. Beard*, 858 S.W.2d 918, 919 (Tex.1993). When no duty exists, no legal liability can arise on account of negligence. *Hanselka v. Lummus Crest, Inc.*, 800 S.W.2d 665, 667 (Tex.App.—Corpus Christi 1990, no writ). The existence of a duty is a question of law for the court to decide from the facts surrounding the occurrence in question. *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex.1990); *Gray v. Baker &*

---

1. This order and invoice are the only memoranda of the contract between Williford and Reda.

2. The rig crew was provided by a separate contractor which is not a party to this litigation.

*Taylor Drilling Co.*, 602 S.W.2d 64, 65 (Tex. Civ.App.—Amarillo 1980, writ ref'd n.r.e.).

■ In support of its theory that it is entitled to recover in tort against Reda, Williford urges that Reda assumed a duty to supervise the entire installation of the ESP system, including Submergible's banding of the cable. It is well established that one who voluntarily undertakes an affirmative course of action for the benefit of another has a duty to exercise reasonable care that the other's person or property will not be injured thereby. *Colonial Sav. Ass'n v. Taylor*, 544 S.W.2d 116, 119 (Tex.1976); *Fox v. Dallas Hotel Co.*, 111 Tex. 461, 240 S.W. 517, 520 (1922); Restatement (Second) of Torts § 323 (1965).

Williford's argument that Reda assumed a duty to supervise Submergible is primarily based on portions of Reda's Field Service Operations Manual and a company newsletter[3] pertaining to the responsibilities Reda assumes when it agrees to install an ESP system. Therefore, we must determine whether statements made in those documents are sufficient to show that Reda assumed a duty to supervise Submergible. In doing so, we must consider all of the evidence bearing upon the relationship of the parties.

In discussing the potential tort liability of parties to a contract, our supreme court has written that "[t]ort obligations are in general obligations that are imposed by law—apart from and independent of promises made and therefore apart from the manifested intention of the parties—to avoid injury to others." *Southwestern Bell Telephone Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex.1991) (quoting W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 92, at 655 (5th ed. 1984) [hereinafter Prosser]). The *De-Lanney* court enumerated several factors it considered useful in the case for distinguishing between tort and contract liability. *Id.* at 495 n. 2. Application of these factors, and other generalizations suggested in Prosser, convinces us that Williford's only remedy was in contract. *See* Prosser at 656–58.

■ The first generalization states that "if the alleged obligation to do or not to do something that was breached could not have existed but for a manifested intent, then contract law should be the *only* theory upon which liability would be imposed." *Id.* at 656 (original emphasis). We believe that the obligation of one contractor to supervise the work of another contractor is not one imposed by law; rather, such an obligation would require a manifested intent by the parties. The fifth generalization states, "the contract or bargaining transaction normally defines the scope of the obligation.... There is a fundamental difference between doing something that causes physical harm and failing to do something that would have prevented harm...." *Id.* at 657. Here, Williford claims that Reda was negligent in failing to supervise Submergible, not that Reda supervised Submergible in a negligent manner. The seventh generalization provides that damages suffered by a promisee in reliance on a promisor to carry out a promise may be recoverable, even if the promise is unenforceable, under a negligence theory. *Id.* at 658. Here, uncontradicted testimony showed that Williford did not have, and was not aware of, the contents of the manual or newsletter at the time the ESP system was installed. Without knowledge of the contents of the manual or newsletter, there could be no reliance on those documents.

Williford also cites authority for the proposition that the adoption of internal policies or

---

**3.** The manual includes the following statements: "It is the responsibility of the pump company's service engineer and the oil company's representative to ensure that the equipment is installed or pulled correctly." "Field service representative must be allowed to stay on site to supervise the entire installation and should not be asked to perform other functions in an area away from the installation." "The field representative should be given the authority to stop the job at any time where he feels the practices being used are not correct."

Reda's newsletter contained a section describing the "normal chain of events" for installation of an ESP system. One of the items detailed that "[w]hile the unit is going in hole, serviceman watches to insure unit is being run properly." Another section states, "[T]he serviceman takes on the responsibility of job supervisor and work coordinator ... generally overseeing the job in the customer's absence."

procedures may establish a duty. The cases Williford cites that are relevant to the question of duty [4] all involved affirmative acts on the part of the defendant. The cited Texas authorities also emphasized reliance on the defendant's acts. *Colonial Sav. Ass'n*, 544 S.W.2d at 120 (reliance on assertion that insurance had been obtained); *Moorhead v. Mitsubishi Aircraft Int'l. Inc.*, 828 F.2d 278, 282 (5th Cir.1987) (pilot reliance on FAA weather briefing); *Gill v. United States*, 429 F.2d 1072, 1075 (5th Cir.1970) (reliance on FAA weather information). *See also Indian Towing Co. v. United States*, 350 U.S. 61, 69, 76 S.Ct. 122, 126, 100 L.Ed. 48 (1955).

Cases from other jurisdictions where a duty was found in the absence of reliance also required affirmative conduct by the defendant. *Martin v. McDonald's Corp.*, 213 Ill.App.3d 487, 157 Ill.Dec. 609, 613, 572 N.E.2d 1073, 1077 (1991), *appeal denied*, 141 Ill.2d 543, 162 Ill.Dec. 491, 580 N.E.2d 117 (franchisor's employee inspected licensee's premises and discussed security precautions); *McCullom v. Regional Transit Auth.*, 616 So.2d 239, 243 (La.Ct.App.1993) (transit authority assumed duty to warn bus drivers of trouble areas).

We have found no support for the proposition that a written procedure or description of a typical installation is, by itself and without reliance by the plaintiff, an affirmative course of action as contemplated by *Colonial Savings Association*, 544 S.W.2d at 120, or the rendering of services under section 323 of the Restatement (Second) of Torts. Thus, the trial court was justified in concluding that Reda owed no duty to Williford to supervise Submergible. In the absence of a duty there can be no liability in tort. *Hanselka*, 800 S.W.2d at 667. Because the trial court's challenged findings of fact are not against the great weight and preponderance of the evidence, Williford's first point is overruled.

■ In its second point, Williford assigns error to the trial court's admission of evidence regarding a subsequent remedial measure taken by Williford. At trial, Williford objected to the evidence as irrelevant and as inadmissible evidence of a subsequent remedial measure. Rule 401 of the Texas Rules of Civil Evidence defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 402 provides that evidence which is not relevant is inadmissible. Tex.R.Civ.Evid. 402. Rule 407 provides that evidence of subsequent remedial measures is inadmissible "to prove negligence or culpable conduct in connection with the event." Tex.R.Civ.Evid. 407.

The evidence challenged is Milburn's testimony that after the loss of the Sell 9–1 well, Williford increased the number of bands used to secure the cable on each stand of tubing from two to three. As there was no contention that Williford's use of two bands per stand of tubing was negligent, the evidence could not have been used to prove Williford's negligence. For the same reason, the evidence was irrelevant and, thus, inadmissible under Rule 402.

■ In its third point, Williford argues that the trial court erred in admitting field tickets representing banding jobs done by Submergible before and after its work on the Sell 9–1. Submergible argues this evidence was probative to show that the banding gun Ralstin used on the job in question functioned properly before, during, and after the job. We disagree. The field tickets do not show that the same banding gun was used on each of the jobs. Without such a showing, the evidence lacked probative value.

■ Under this point, Williford also challenges the court's admission of the testimony of David Tidwell (Tidwell), Submergible's witness and vice-president. Williford contends the testimony was not admissible because Tidwell was an undisclosed expert witness or because such evidence was improper

---

4. Other cases Williford cites concern the effect of policies on the standard of care rather than the question of duty, *Alvarado v. City of Brownsville*, 865 S.W.2d 148 (Tex.App.—Corpus Christi 1993, writ granted) (jail manual set standard of care for common law duty of jailer to care for prisoner); *Edelin v. Westlake Community Hosp.*, 157 Ill.App.3d 857, 109 Ill.Dec. 890, 893, 510 N.E.2d 958, 961 (1987) (failure to follow policy was evidence of breach of duty to patient).

opinion testimony by a lay witness. Submergible concedes that Tidwell was not qualified as an expert on the removal of submersible pumps. Williford timely objected to questions concerning Tidwell's opinion as to (1) what a rig operator should do when a cable fails to come out of the well with the tubing, (2) whether a rig operator should put on another stand of tubing and lower the assembly back down the well, and (3) whether it would be a mistake to continue pulling on the tubing when the cable stopped moving. Apparently, the trial court overruled these objections because Tidwell's answers were based on his personal observations of previous removal operations. With the exception of Tidwell's answer to the first question, which was stated in terms of his personal observations of previous removal operations, we agree with Williford that Tidwell's answers were improper expert witness testimony.

■▬▬▬ To obtain a reversal predicated upon evidentiary rulings, an appellant must show not only that the trial court's ruling was erroneous, but that the error was calculated to cause, and probably did cause, the rendition of an improper judgment. In making that assessment, the reviewing court must consider the entire record. *McCraw v. Maris,* 828 S.W.2d 756, 757 (Tex.1992); *Boothe v. Hausler,* 766 S.W.2d 788, 789 (Tex.1989); Tex.R.App.P. 81(b)(1). It is also the rule that, in reviewing the evidentiary rulings made in a bench trial, the appellate court generally assumes the trial court disregarded any incompetent evidence. The admission of such evidence will generally not require reversal of the judgment where there is competent evidence to authorize its rendition. *Gillespie v. Gillespie,* 644 S.W.2d 449, 450 (Tex. 1982); *Southwestern Bell Media, Inc. v. Lyles,* 825 S.W.2d 488, 498 (Tex.App.—Houston [1st Dist.] 1992, writ denied); *Blanco v. Gracia,* 767 S.W.2d 896, 898 (Tex.App.—Corpus Christi 1989, no writ). Our examination of the rather lengthy record in this case satisfies us that there is other competent evidence supporting the trial court's rulings. Accordingly, we find nothing to prevent the application of the presumption that the trial court disregarded the inadmissible evidence.

Thus, Williford's second and third points are overruled.

■▬▬ Under its fourth point, Williford challenges the admission of the testimony of Submergible's expert witness, Ralph Busse (Busse), and the introduction of a diagram in support of his testimony. Williford asserts that the trial court erred in failing to exclude this evidence under Rule 215(2)(b) of the Texas Rules of Civil Procedure after Submergible failed to supplement its discovery responses concerning Busse's expected testimony and the spoliation of physical evidence. The applicable standard of review for discovery sanctions is abuse of discretion. *Bodnow Corp. v. City of Hondo,* 721 S.W.2d 839, 840 (Tex.1986) (per curiam); *Johnson v. Berg,* 848 S.W.2d 345, 352 (Tex.App.—Amarillo 1993, no writ).

■▬▬ We will first address the admission of the hand drawn diagram created by Busse during the trial. The diagram was used to illustrate Busse's determination of the amount of vertical force a band would support before it would fail. This opinion was based on the testimony of Williford's expert, John Harcourt (Harcourt), concerning the amount of force required to break an improperly crimped band. The diagram, and the testimony it illustrated, were presented in an attempt to meet the testimony of Williford's expert at trial. Submergible's discovery responses show that the subject matters on which Busse was expected to testify included the ability of the steel bands to support the cable. Therefore, the diagram was within the subjects Submergible designated as matters about which Busse would testify. *See Rampel v. Wascher,* 845 S.W.2d 918, 922 (Tex.App.—San Antonio 1992, writ denied).

Williford also made the objection that Harcourt's expert testimony, which the diagram was offered to rebut, was known to Busse before trial because such testimony was elicited during a pretrial deposition. Williford has failed to point to, and we are unable to find, Harcourt's deposition testimony in the record. Williford has failed to meet its obligation to present a record showing error in this regard. Tex.R.App.P. 50(d); *St. Paul Medical Center v. Cecil,* 842 S.W.2d 808, 816–17 (Tex.App.—Dallas 1992, no writ).

Williford next argues that the trial court erred in failing to exclude Busse's testimony because of Submergible's "intentional or negligent spoliation of unique physical evidence." Williford identifies the "physical evidence" as the bands Busse tested to evaluate the performance of Submergible's banding guns and the effect of pulling the tubing while the cable, which was banded to the tubing, was restricted or anchored. Busse's experiment did not involve any of the bands, tubing, or cable used in the Sell 9–1 well. During Busse's deposition, Williford asked to inspect the bands used during Busse's experiment. Submergible agreed to permit Williford to inspect the bands if they were still in existence. The bands, however, were never produced and Submergible claims that they cannot be found. Williford argues that Busse's testimony should have been excluded because of this failure to produce the bands.

Williford asserts several theories on which it claims the trial court should have excluded Busse's testimony. We initially address Williford's claims that the trial court erred in failing to (1) exclude Busse's testimony under Rule 215(2)(b) and its "inherent authority-based sanctions" because of Submergible's "intentional or negligent spoliation of unique physical evidence," and (2) in failing to apply the presumption that the spoliated evidence was favorable to Williford. Williford cites, and we have found, no Texas case in which a trial court has excluded evidence on the basis of spoliation. Williford apparently argues that Submergible's failure to produce the experimental bands was a refusal to comply with a proper discovery request under Rule 215(2)(b). However, Rule 166b(2)(b) of the Texas Rules of Civil Proce-

dure provides that "[a] person is not required to produce a document or tangible thing unless it is within the person's possession, custody, or control." There is no evidence in the record that Submergible intentionally disposed of the experimental bands so as to make them unavailable for discovery.

Williford also asserts that the court had "inherent authority" to impose sanctions for the alleged spoliation of the experimental bands. Although it has been argued, persuasively we believe, that Texas courts do not retain inherent authority to impose sanctions for discovery abuse, Kevin F. Risley, *Why Texas Courts Should Not Retain the Inherent Power to Impose Sanctions*, 44 Baylor L.Rev. 253 (1992),[5] we will assume, without deciding, that the trial court had the authority to impose sanctions for spoliation of evidence.

Even so, we do not find that the trial court abused its discretion by failing to exclude Busse's testimony. In those cases from other jurisdictions where courts applied sanctions for the spoliation of evidence,[6] whether based on a rule or inherent authority, each involved the intentional destruction of evidence which was the subject of the litigation, not evidence used by an expert for purposes of experimentation. As the bands with which Busse conducted his experiments did not come from the Sell 9–1, they did not have the uniqueness Williford ascribes to them. There is also no evidence that the unavailability of the bands was due to intentional destruction.

Williford next contends that the trial court erred in failing to apply the rule that the intentional spoliation of evidence raises a

**5.** One recent decision has expressly held that trial courts do have inherent authority to impose sanctions in certain circumstances. *Kutch v. Del Mar College*, 831 S.W.2d 506, 510 (Tex.App.—Corpus Christi 1992, no writ).

**6.** *Dillon v. Nissan Motor Co.*, 986 F.2d 263, 268 (8th Cir.1993) (intentional destruction of automobile involved in accident); *Unigard Sec. Ins. Co. v. Lakewood Eng'g and Mfg.*, 982 F.2d 363 (9th Cir.1992) (destruction of heater claimed to have caused fire); *Barker v. Bledsoe*, 85 F.R.D. 545 (W.D.Okla.1979) (destructive autopsy of body where cause of death was at issue); *Bolton v. Mass. Bay Transp. Auth.*, 32 Mass.App.Ct. 654,

593 N.E.2d 248 (1992) (destruction of bus involved in accident); *Nally v. Volkswagen of America, Inc.*, 405 Mass. 191, 539 N.E.2d 1017 (1989) (intentional removal of relevant part of automobile involved in accident); *Fire Ins. Exch. v. Zenith Radio Corp.*, 103 Nev. 648, 747 P.2d 911 (1987) (intentional destruction of TV claimed to have caused fire). It should also be noted that in each of these cases, except *Bolton*, it was the plaintiff who destroyed the evidence. *Bolton* involved the destruction of evidence after the plaintiff had made a specific request to preserve the evidence.

presumption that the evidence was unfavorable to the spoliator. *See H.E. Butt Grocery Co. v. Bruner*, 530 S.W.2d 340, 344 (Tex.Civ. App.—Waco 1975, writ dism'd by agr.). This rule, however, applies when evidence has been intentionally destroyed, not merely lost. *Brewer v. Dowling*, 862 S.W.2d 156, 160 (Tex. App.—Fort Worth 1993, writ denied). As noted above, Williford has presented no evidence that Submergible's inability to produce the experimental bands was due to intentional, or even negligent, destruction. Thus, Williford was not entitled to the benefit of this presumption. *Id.*

■ Williford also argues the trial court erred in overruling its objection that the probative value of Busse's testimony was substantially outweighed by the unfair prejudice Williford would suffer by the admission of the evidence. *See* Tex.R.Civ.Evid. 403. Williford asserts such unfair prejudice by virtue of having made its physical tests and evidence available to opposing counsel while being denied the same privilege by Submergible. Rule 403 generally comes into play when the probative value of the evidence is low or the problems with the evidence are serious. *Farr v. Wright*, 833 S.W.2d 597, 602 (Tex.App.—Corpus Christi 1992, writ denied). Under this record, we find that the trial judge did not abuse his discretion in determining that the possible prejudice to Williford was not sufficient to substantially outweigh the probative value of Busse's testimony. Williford's fourth point is overruled.

In its fifth point, Williford argues that the findings of fact supporting the judgment in favor of Submergible are contrary to the great weight and preponderance of the evidence or are supported by insufficient evidence. Williford established, and the trial court found, that Submergible was hired to install the bands securing the cable to the tubing in the Sell 9–1 well. Williford specifically attacks the court's findings of fact 6, 8, 9, 10, 11, 12, 14, 16, 18, 19, 20, 21, 22, 23, and 24 as contrary to the great weight and preponderance of the evidence at trial. Williford also challenges findings of fact 14, 16, and 17 as unsupported by sufficient evidence. The challenged findings center around three propositions: Submergible was not negligent in banding the cable to the tubing, the cable began slipping due to a down-hole problem unrelated to the banding, and Williford was negligent in continuing to pull the tubing after the cable became stuck.

■ The record shows there was some evidence to support the court's findings that Submergible was not negligent in banding the cable to the tubing and that the cable began slipping due to a down-hole problem unrelated to the banding. Ralstin testified that he visually examined the bands as they were installed and periodically shook the cable to ensure that it was firmly attached. He also testified that he used the same banding guns on other banding jobs before and after the Sell 9–1 and experienced no problems on those jobs. Busse testified that his examination of the banding guns used on the Sell 9–1 indicated that when the guns received the air pressure necessary to cut the banding material (the final operation performed by the guns), the procedure adequately crimped the band. He also testified that the cable could have been restrained down-hole by factors unrelated to Submergible's banding operation. Such possibilities included the cable being caught in gaps in joints between sections of the well casing, damage to the casing, deviation of the well, or build-up of paraffin or salt. This evidence was sufficient to support the court's findings of fact that Submergible was not negligent in its installation of the bands.

■ However, we agree with Williford's contention that there was insufficient evidence to support fact finding no. 17 that Williford was "negligent in applying excessive force to the tubing." There was evidence that Williford applied approximately 63,000 pounds of tension to the tubing string which weighed 35,000 pounds. We find no competent evidence in the record demonstrating that Williford's actions were negligent. As noted above, Tidwell's testimony that the force applied to the tubing string was a mistake was improper expert witness testimony and, as such, may not be considered. The court also excluded Busse's opinions on whether it was a mistake to continue pulling tubing after the cable became stuck. Reda's manual, which provided that "any

time when tubing is being pulled and cable is not following exactly, stop and contact pump company representative for directions," is not evidence that Williford was negligent in continuing to apply force where Reda's representative was consulted and did not direct another course of action.

 This insufficiency of the evidence to support the court's finding that Williford was negligent, however, did not cause the rendition of an improper judgment such as is required for reversal under Rule 81(b)(1) of the Texas Rules of Appellate Procedure. The question of Williford's negligence in this action was only relevant to the determination of damages. That is, for purposes of mitigation under Williford's contract theory, *City of San Antonio v. Guidry*, 801 S.W.2d 142, 152 (Tex.App.—San Antonio 1990, no writ), and for comparative responsibility under its tort theory, Tex.Civ.Prac. & Rem.Code Ann. §§ 33.001–.016 (Vernon 1986 & Supp.1994). In the absence of liability on the part of Submergible or Reda, the finding that Williford was negligent was irrelevant.

We next consider the evidence contrary to the court's findings that Submergible was not negligent in installing the bands and that a down-hole problem caused the cable to slip. We must determine whether such evidence is so overwhelming as to make the court's findings against the great weight of the evidence and manifestly unjust. This requires that we review Williford's evidence in some detail.

On direct examination, Harcourt, Williford's expert, explained the mechanical action by which the banding gun draws tight and crimps the buckle which secures the banding material around the tubing and cable. Harcourt testified that, in order to be properly secured, the crimp must perforate the buckle to create a mechanical interlock between the various layers of steel. Harcourt further testified that in several of the bands recovered from the Sell 9–1, the crimp only indented or deformed the buckle and did not perforate the buckle. He explained that this type of crimp was inadequate. Based upon his own experiments, Harcourt asserted that a "properly" crimped buckle had a breaking strength of 700 to 1,000 pounds and that "improperly" crimped buckles were only about half as strong. Williford introduced bands where the buckles had failed and a section of the cable which was devoid of any deformation which would have resulted from a proper installation of the bands.

Williford also sought to show that the bands in the Sell 9–1 were not properly tightened. In support thereof, Williford presented Harcourt's testimony that the bands recovered from the Sell 9–1 showed that the feedwheel, the mechanism on the banding gun which pulled and held the band tight while the buckle was crimped, was slipping or "milling" on the bands. Williford argued that this evidence of slippage, due to dirt on the feedwheel or a worn wheel, proved that the bands were not properly tightened.

Williford challenged Submergible's theory that a down-hole problem restrained the cable which, in turn, caused the bands to slip and fail. Williford offered testimony that just before the ESP equipment was installed, a full-gauge packer, or plug, was removed from near the bottom of the Sell 9–1. Williford argues that as the packer was only slightly smaller than the inside of the casing, its removal would have revealed any defects or obstructions in the casing. There was also testimony that there was no evidence of paraffin or salt accumulations sufficient to interfere with the ESP pulling operation.

Although the evidence presented difficult questions for the trial court, as the finder of fact, we cannot agree that Williford's evidence was so overwhelming as to make the trial court's findings clearly wrong or manifestly unjust. Williford produced only a small number of the approximately 500 bands which were installed in the Sell 9–1. There was testimony that even the "improperly" crimped bands were sufficiently strong to support the cable. Testimony indicated that a few bands will be expected to fail in any ESP installation. Williford could not show whether or not the bands which had separated were the result of the fishing operation or the pulling operation. The evidence of slippage of the feedwheel on the banding gun failed to show that the gun would not produce sufficiently tight bands or the number of bands on which the feedwheel was slipping.

There was evidence that a break in the casing was discovered during the fishing operation. Williford argued that this damage occurred during the fishing operation. Submergible, however, asserted that it may have existed at the time the ESP was pulled. Submergible's theory that the cable was caught in a gap between two sections of casing is not inconsistent with the pulling of the full-gauge packer. Williford's evidence only presented a fact question which the trial court resolved in Submergible's favor.

Again, although the trial court erred in finding that Williford was negligent in forcing the tubing after the cable became stuck, the court's findings that Submergible was not negligent render this finding immaterial to the court's judgment and the error was harmless. Tex.R.App.P. 81(b)(1); *McCardell v. Peterson*, 493 S.W.2d 288, 289 (Tex.Civ. App.—Houston [1st Dist.] 1973, no writ) (construing Rule 434 of the Texas Rules of Civil Procedure, the predecessor of Rule 81). Finding that the other challenged findings are not against the great weight and preponderance of the evidence, we overrule Williford's fifth point of error.

In its sixth point, Williford assigns error to the trial court's refusal to permit it to amend its petition to join other working interest owners or to clarify that it represented the interests of all the working interest owners. Its seventh point challenges the court's exclusion of evidence showing the percentage of ownership of each of the working interest owners at the time of trial. Each of these matters go to the amount of damages which may be recoverable by each of the working interest owners. Because of our disposition of the previous points upholding the trial court's findings that Reda and Submergible are not liable to Williford, we need not address these points.

In summary, having overruled each of Williford's points of error, we affirm the judgment of the trial court.