RAYMOND R. MARTIN, SR., *et al.*, Coadm'rs of the Estate of Laura Martin, Deceased, *et al.*, Plaintiffs-Appellees, v. McDONALD'S CORPORATION *et al.*, Defendants-Appellants (Maureen Kincaid *et al.*, Plaintiffs-Appellees).

First District (5th Division) No. 1—89—1314

Opinion filed May 3, 1991.

488

Gorham, Metge, Bowman & Hourigan, of Chicago (Robert J. Hourigan, of counsel), for appellant.

John J. Henely, Ltd., of Chicago (John J. Henely, David A. Novoselsky, Susan E. Loggans, and Mary Jo Kelly, of counsel), for appellees.

JUSTICE McNULTY delivered the opinion of the court:

This case involves an appeal by McDonald's Corporation from judgments in favor of plaintiffs Raymond R. Martin, Sr., Marianne Martin, Maureen Kincaid and Therese Dudek. The trial court awarded damages in the amount of $1,003,445.37 to Raymond R. Martin, Sr., and Marianne Martin for the wrongful death of their daughter, Laura Martin. It also awarded damages of $125,000 each to Maureen Kincaid and Therese Dudek for the negligent infliction of emotional distress. McDonald's appeals not only the judgment of the trial court awarding damages to the plaintiffs, but also the denial of its post-trial motion for judgment notwithstanding the verdict.

This case arose from a murder and robbery which took place after closing hours of the McDonald's restaurant in Oak Forest, Illinois, late in the evening of November 29, 1979. On that evening, a six-woman teenaged crew was working to clean up and close the restaurant; Laura Martin, Therese Dudek and Maureen Kincaid were members of that crew. A person later identified as Peter Logan appeared in the back of the restaurant and ordered the crew into the refrigerator and the assistant manager, Therese Dudek, to open the safe and get him money. In the course of moving the crew into the refrigerator, Laura Martin was shot and killed, and Maureen Kincaid and Therese Dudek were assaulted by Logan. Laura Martin's parents claimed damages from McDonald's Corporation for the wrongful death of their daughter, and Therese Dudek and Maureen Kincaid claimed damages for the negligent infliction of emotional distress. The trial court awarded damages to all three victims, and McDonald's Corporation appealed.

NEGLIGENCE CLAIMS

In order for plaintiffs to recover on a theory of negligence, they must establish that there was a duty owed to them by defendant, that defendant breached its duty, that they were injured, and that defendant's breach of duty or negligence was the proximate cause of their injuries. The question of duty, the legal obligation imposed upon one for the benefit of another, is a question of law to be determined by the court. *Fancil v. Q.S.E. Foods, Inc.* (1975), 60 Ill. 2d 552, 555, 328 N.E.2d 538, 539.

Defendant, McDonald's Corporation, contends that it had no duty to protect Laura Martin, Maureen Kincaid or Therese Dudek since it was merely the licensor of the business that was operated by McDonald's Restaurants of Illinois, and plaintiffs were employees of the licensee. McDonald's asserts that it had no duty to plaintiffs, as it had no "special relationship" (such as common carrier/passenger, innkeeper/guest, possessor of land/member of the public, or one who has custody of another who is deprived of the opportunity to protect himself) with them as required by section 314 of the Restatement (Second) of Torts (1965).

■■ Plaintiffs, however, do not ask this court to determine that defendant McDonald's owed them a duty of care because it had a special relationship to them. Rather, they insist that McDonald's owed them a duty of care and protection because it had voluntarily assumed such a duty. Case law supports the proposition that liability can arise from the negligent performance of a voluntary undertaking. (See *Nelson v. Union Wire Rope Corp.* (1964), 31 Ill. 2d 69, 199 N.E.2d 769.) In *Nelson,* an insurance company voluntarily undertook the inspection of a construction site. When an accident occurred, the insurance company claimed that it had no duty regarding the safety of the equipment involved. Although this case involved the construction of Florida law, the Illinois Supreme Court noted that Florida, like Illinois, has recognized the doctrine that liability can arise from the negligent performance of a voluntary undertaking, and found the insurance company liable for the negligent performance of its voluntary inspection of the construction site. *Nelson,* 31 Ill. 2d at 74.

The negligent performance of a voluntary undertaking has also been used as a basis for imposing liability in two Illinois landlord-tenant cases. In *Cross v. Wells Fargo Alarm Services* (1980), 82 Ill. 2d 313, 412 N.E.2d 472, the plaintiff was severely beaten and injured by several unknown men as he was waiting for an elevator in the lobby of property owned by the Chicago Housing Authority. The trial court dismissed plaintiff's complaint after noting that there is "no duty in Illinois or at common law upon a landlord to protect tenants or social guests from the criminal acts of third parties." (*Cross,* 82 Ill. 2d at 317.) The supreme court reversed the dismissal, holding that the general rule which states that a landowner is not liable for the consequences of a criminal assault by third persons does not apply when the landowner has voluntarily assumed a duty with regard to security measures. In this case, the landlord had provided part-time guard services, and as a result of the manner in which these services were provided, the incidence of crime in the projects and danger to the tenants

was actually increased. (*Cross*, 82 Ill. 2d at 317.) In *Phillips v. Chicago Housing Authority* (1982), 89 Ill. 2d 122, 127-28, 431 N.E.2d 1038, the supreme court held that the scope of the voluntarily assumed duty is not limited to the situations where the undertaking increases the danger or creates a new risk of harm. The failure to properly complete or to carry out an assumed duty imposes liability in the same manner as for dangers affirmatively created during the course of the assumed undertaking. *Phillips*, 89 Ill. 2d at 127-29.

Plaintiffs argue that McDonald's, like the insurance company in *Nelson*, and the Chicago Housing Authority in *Phillips* and *Cross*, had assumed an increased responsibility for their care and protection, and as such, was liable for the negligent performance of this voluntary undertaking. Even though McDonald's had no duty imposed by law to protect plaintiffs against the criminal acts of third parties, it had voluntarily recognized the threat of armed robbery and the importance of security in the restaurants, especially in the time period immediately after closing. It had created a branch of its corporation assigned to deal with security problems and had prepared a bible for store security operations. McDonald's, through its regional security manager, Jim Carlson, undertook not only the obligation to check for security problems, but also to communicate to the store management what the security policies were and to "follow-up" to be certain that the problems had been corrected and the "recommended" security procedures "followed."

Defendant urges the court to consider the separate and distinct nature of McDonald's Corporation and McDonald's Restaurants of Illinois, Inc. It asserts that McDonald's Corporation was only the licensor of a business that was operated by McDonald's Restaurants, Inc., and that McDonald's Restaurants, Inc., was the employer of the plaintiffs. Even though all this is in fact true, it only goes to the legal relationship of McDonald's Corporation to the plaintiffs. No matter what legal relationships existed, it was McDonald's Corporation which undertook to provide security and protection to plaintiffs.

■ It was McDonald's Corporation's regional security manager, Jim Carlson, who acted directly as security supervisor for the newly acquired Oak Forest McDonald's, even though this restaurant was directly owned by McDonald's Restaurants of Illinois, Inc. Since McDonald's Restaurants of Illinois had neither an operations manager nor a security supervisor, these positions were handled by Steve Zdunek and James Carlson, two executives from defendant McDonald's Corporation.

On October 31, 1979, both Carlson and Zdunek visited the Oak Forest store. Carlson met with the store manager, Karl Ferret, and although he did not provide Ferret with a copy of the McDonald's bible of security procedures which Carlson had written, he did inform Ferret about McDonald's proper closing procedures, specifically stating that no one should go out or throw garbage out the back door after dark. Trash or grease were to be taken out the side glass door at least one hour prior to closing by one employee while another watched from inside. This was required as part of McDonald's security policy to thwart entry by an unauthorized person into the store. During this visit to the store, Carlson also did a security check, and made certain security changes which included changing locks and ordering a new security window and Detex alarm system for the back door.

The trial court correctly determined that McDonald's Corporation had a duty to protect plaintiffs Laura Martin, Maureen Kincaid and Therese Dudeck from harm. Although it did not specifically state that such duty was "assumed," there is ample support in case law and the facts of this case to support a determination that McDonald's Corporation voluntarily assumed a duty to provide security to plaintiffs and protect them from harm.

■ Once McDonald's Corporation assumed the duty to provide security and protection to plaintiffs, it had the obligation to perform this duty with due care and competence, and any failure to do so would lead to a finding of breach of duty. (See *Nelson*, 31 Ill. 2d at 85-86.) While McDonald's argues that the duty it assumed was, like the insurer in *Nelson*, only to inspect and warn, the testimony of its regional security manager, Jim Carlson, and its operations manager, Steve Zdunek, reveals that the duty assumed included follow-up in addition to inspection and warning in order to be sure that security policies were being carried out. Both Zdunek and Carlson also testified that neither one of them followed up. Although they acknowledged that back door security was crucial, Carlson had not visited the store since the take-over, and while Zdunek had visited the store several times for the purposes of ensuring that operations conformed to McDonald's manuals as far as cleanliness, appearance of the crew, preparation of food, etc., he admitted that he was never there at night to see that proper closing procedures were being followed. Even if there was not sufficient time between the take-over and the armed robbery to order, receive and install the security window and the Detex alarm system, there certainly was time to make an on-site evening inspection to be sure that proper closing procedures were being followed,

and that the primarily teenaged work force was properly instructed as to closing procedures. Yet neither Zdunek nor Carlson ever checked to be sure that the back door was not being used after dark or that signs were posted on the door warning employees not to use this door after dark. Neither checked to be sure that the primarily teenaged work crews received proper instructions about the use of the back door. In fact, several of the employees testified that they had never received a security manual, had never seen warning signs on the back door, and had never been instructed not to use the back door after dark. Furthermore, neither Zdunek nor Carlson had ever noticed the dumpster that was pulled up to the back door after dark so that employees could dump garbage simply by opening the back door.

Thus, McDonald's clearly established a security policy which unquestionably included a follow-up. Nevertheless, its key security people, Carlson and Zdunek, admittedly failed to follow up. McDonald's argument that the employees were already familiar with security procedures and did not need to be instructed is belied by the facts of the actual operation of the restaurant. Trial testimony proved that the work crew used the back door exclusively, both before and after dark, and emptied garbage and grease through this door all day and all night. A dumpster was brought to the rear door of the restaurant at night to facilitate garbage removal. Failure to empty grease at night would result in a reprimand to employees. In view of this established operating procedure, it is meaningless for McDonald's to argue that employees were familiar with back door security and that a follow-up was unnecessary. Therefore, the duty which McDonald's defined for itself included a follow-up which was doubly necessary because of the operating conditions of the restaurant. Accordingly, there was ample evidence for the jury to determine that McDonald's had breached its assumed duty to plaintiffs.

■ McDonald's argues that even if it had and breached a duty to plaintiffs, there is no evidence to support the contention that anything McDonald's Corporation did or failed to do was the proximate cause of the entry of Logan onto the premises and the subsequent injury to the plaintiffs. McDonald's cites the case of *N.W. v. Amalgamated Trust & Savings Bank* (1990), 196 Ill. App. 3d 1066, 554 N.E.2d 629, in which summary judgment was granted to the defendants because no facts were alleged which could establish that their acts were the proximate cause of plaintiffs' injuries. The instant action is dissimilar to the cited authority in that there is a great deal of circumstantial evidence from which the jury could conclude that defendant's actions were a proximate cause of plaintiffs' injuries. Rebecca Snella, a 17-

year-old employee of the Oak Forest McDonald's, testified that she was in charge of doing dishes the night of the armed robbery. The sink where she was working was on the same wall as the rear door. There was also a bathroom door within four feet of where she was working. Although Rebecca did not watch the bathroom door all night, she testified that she would have been aware of someone coming from that door. While she did not see Peter Logan (the robber) come through the back door, she stated that he approached her from the rear of the store. Logan himself testified that though he was under the influence of drugs and could not remember much about the evening, he did remember that he was attracted by the light over the back door. Moreover, Logan had been convicted of another robbery of a McDonald's in Alsip three months earlier. There was conflicting testimony at trial about whether the earlier robbery involved an employee taking garbage out the back door after closing. There was also conflicting testimony about whether the rear door in the Oak Forest McDonald's latched properly, and evidence that it had been opened at least twice after closing, once when employee Janet Brown went home, and again when Rebecca Snella emptied the garbage. While it is true that there is no direct evidence that Peter Logan entered the store through the rear door, there is more than ample circumstantial evidence on which the jury could conclude that Logan did indeed gain entry to the McDonald's through the rear door and that the failure of McDonald's security procedures facilitated that entry and were thus the proximate cause of injury to plaintiffs.

Defendant McDonald's Corporation also contends that even if it had and breached a duty to plaintiffs which proximately caused their damages, such damages consist of emotional injuries only and as such are not compensable under the law. As support for this proposition, McDonald's relies on the zone of danger rule and the physical injury requirement established by the Illinois Supreme Court in *Rickey v. Chicago Transit Authority* (1983), 98 Ill. 2d 546, 457 N.E.2d 1. *Rickey* applied to a child plaintiff who claimed damages for emotional distress after seeing his brother strangled when his scarf became caught in a Chicago Transit Authority escalator. In that case, the court held that in order to maintain an action for the negligent infliction of emotional distress a plaintiff needed to be in the zone of physical danger and needed to show physical injury or distress incurred as a result of the emotional distress caused by defendant's negligence. *Rickey*, 98 Ill. 2d at 555.

■ We find the *Rickey* analysis inapplicable to the instant action. Plaintiffs Maureen Kincaid and Therese Dudek were not bystanders in

a zone of danger who suffered emotional distress as a result of observing the murder of their co-worker. Rather, they were direct victims of an assault and battery perpetrated by Peter Logan and proximately caused by defendant McDonald's negligence. Furthermore, both plaintiffs suffered lingering physical manifestations of their emotional distress. Both became depressed and withdrew from family and friends. Maureen Kincaid developed a fear of going out at night, became afraid to remain in her own home, and even contracted severe intestinal problems leading to a diagnosis of ulcerative colitis. Therese Dudek suffered from insomnia for a period of at least two years and could not eat regular meals. Both plaintiffs sought treatment from a counselor to help them deal with their problems.

Plaintiffs maintain that their case should be controlled by *Corgan v. Muehling* (1988), 167 Ill. App. 3d 1093, 522 N.E.2d 153 (on leave to appeal to Illinois Supreme Court), which held that the *Rickey* requirement of physical injury did not apply to direct victims of a defendant's negligent infliction of emotional distress. In *Corgan*, the Illinois Appellate Court considered the issue of a psychologist's malpractice *vis-a-vis* his patient and found it "inappropriate" to apply the *Rickey* requirements of zone of danger and physical injury to direct victims of a defendant's negligence. (*Corgan*, 167 Ill. App. 3d at 1102.) In support of this approach, the *Corgan* court noted the reasoning in *McAdams v. Eli Lilly & Co.* (N.D. Ill. 1986), 638 F. Supp. 1173, 1178, and *Lewis v. Westinghouse Electric Corp.* (1985), 139 Ill. App. 3d 634, 638, 487 N.E.2d 107 (Linn, J. dissenting), as well as several social work malpractice cases, *Horak v. Biris* (1985), 130 Ill. App. 3d 140, 474 N.E.2d 13, and *Wogelius v. Dallas* (1987), 152 Ill. App. 3d 614, 504 N.E.2d 791.

While there is conflicting case law regarding the *Corgan* approach (see *Lewis*, 139 Ill. App. 3d 634 (majority opinion); *Hammond v. Lane* (1987), 162 Ill. App. 3d 17, 515 N.E.2d 828), and although we realize that the factual situation in the instant action is not identical to that in *Corgan*, we nevertheless find this approach persuasive in considering the issues raised by the case at bar.

Maureen Kincaid and Therese Dudek suffered the physical impact of Logan's gun. Moreover, they were direct victims not only of Logan's assault and battery, but also of McDonald's negligence. The physical injury requirements of the *Rickey* zone of danger rule, fashioned for a bystander case, cannot be applied here to achieve an equitable result. Furthermore, this factual setting, which involves both negligence, murder, assault and battery, is so unique as to be unlikely to pave the way for future frivolous allegations of emotional distress.

Thus, for these reasons and based on the facts of this case, we find that plaintiffs Maureen Kincaid and Therese Dudek have stated a valid claim for the negligent infliction of emotional distress and are entitled to damages recognizable under the law.

WORKERS' COMPENSATION CLAIM

■ McDonald's Corporation argues that if this court finds it had an agency relationship with Karl Ferret, the manager of the Oak Forest McDonald's, then this agency relationship had to be for the operation of the restaurant, which would make McDonald's Corporation the joint employer of Ferret and the plaintiffs. If this situation would be found to exist, McDonald's claims that it should be afforded the protection given in section 5(a) of the Illinois Workers' Compensation Act (Ill. Rev. Stat. 1987, ch. 48, par. 138.5(a)), which states that the employee's exclusive remedy for injury incurred in the course of employment against the employer is under the Act.

The jury in the case at hand correctly determined that Karl Ferret was the agent of McDonald's Corporation. Jim Carlson and Steve Zdunek communicated directly with Ferret about security operations and management of the restaurant, and also had the ability to discharge Ferret. The jury also determined that because of the agency relationship between Ferret and McDonald's Corporation, Ferret's negligence in communicating safety procedures to the employees was attributable to McDonald's Corporation. Even though this negligence is attributable to McDonald's Corporation, it is not necessary to a finding of negligence on the part of McDonald's Corporation, as McDonald's Corporation was directly liable for its own negligence due to the failure of security procedures and the failure of Carlson and Zdunek, who were unquestionably its employees, to follow up. Nevertheless, the finding of an agency relationship between McDonald's Corporation and Ferret and the subsequent attributing of Ferret's negligence to McDonald's Corporation still does not make McDonald Corporation Ferret's employer. It certainly does not make McDonald's Corporation the employer of the plaintiffs, and does not therefore implicate the Workers' Compensation Act.

CLAIMS OF TRIAL COURT ERROR

■ Defendant McDonald's Corporation claims that the trial court erred in allowing the testimony of plaintiffs' security expert, Michael Caccitolo, as such testimony improperly relied upon witness depositions, and further, it related to matters of common knowledge. In support of its argument that Caccitolo improperly relied upon deposition

testimony, McDonald's cites the case of *Dugan v. Weber* (1988), 175 Ill. App. 3d 1088, 530 N.E.2d 1007, in which a testifying doctor/expert was not permitted to testify to facts and opinions which were based on the report of another doctor made in anticipation of the trial of the case, although the doctor could have testified based on facts and opinions prepared by medical personnel in the course of treating the injured party. While the doctor in *Dugan* had a choice of materials on which to rely, plaintiffs' expert had no such options. Other than deposition testimony, there were no independent reports prepared by witnesses. Also, defendant argues that deposition testimony should not be relied upon because it is self-serving. However, the self-serving nature of deposition testimony is overestimated by defendant, as such testimony is used to impeach witnesses at trial. Furthermore, although defendant suggests that Mr. Caccitolo could have relied upon trial testimony in forming his opinions, this would have been impossible as Supreme Court Rule 220 (134 Ill. 2d R. 220) requires that the opinions of an expert witness be disclosed in advance of trial. Moreover, if defendant was convinced of the unreliability of Mr. Caccitolo's testimony, it could have impeached his credibility by requiring him to disclose the basis of his opinions on cross-examination. See *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322.

Defendant also asserts that Mr. Caccitolo's testimony was improperly admitted as it was based on matters of common knowledge, such as safety practices and procedures at the restaurant. Although case law supports the argument that expert opinions may not be admitted on matters of common knowledge (see *Ray v. Cock Robin, Inc.* (1973), 10 Ill. App. 3d 276, 293 N.E.2d 483, *aff'd* (1974), 57 Ill. 2d 19, 310 N.E.2d 9 (in which an expert was not permitted to testify as to what safety device would stop a vehicle from entering a picnic area)), it does allow for such opinions when the subject matter is difficult to comprehend. (See *Deerhake v. DuQuoin State Fair Association, Inc.* (1989), 185 Ill. App. 3d 374, 391, 541 N.E.2d 791.) In *Deerhake*, a case involving an accident which occurred at an unsanctioned drag race, plaintiffs' witness was properly allowed to testify as to the management of large groups of people and matters of crowd control. Security procedures in a restaurant are no more a matter of common knowledge than procedures of crowd control. In fact, restaurant security was so complicated that McDonald's itself hired an expert, Jim Carlson, to advise it on such matters.

McDonald's also alleges that plaintiffs' expert merely repeated testimony of the other witnesses. To the extent that repetition was in-

volved, it was not prejudicial, and as stated above, cross-examination could have discredited any unreliable testimony.

 ■■■ The defendant also objects to certain jury instructions given by the trial court. These objections will be considered in turn. Defendant first objects to the giving of instruction IPI Civil No. 10.04 (Illinois Pattern Jury Instructions, Civil No. 10.04 (1968) (hereinafter IPI Civil)), which provides that it was the duty of the defendant to use ordinary care for the safety of the plaintiff. This instruction was given three times, once as to each plaintiff. Defendant objects to this instruction because it contends that it had no duty to plaintiffs, and also because the trial judge did not advise the jury as to what it was that created defendant's duty. The objection to this instruction on the grounds that defendant had no duty to plaintiffs is simply a rehash of defendant's arguments requesting a directed verdict, which was denied by the trial judge. The determination that defendant did have a duty to plaintiffs was a determination of law, was made by the trial judge, and is supported by the evidence. Therefore, the giving of such an instruction was not improper. The trial judge's failure to explain the reason for his determination of duty does not render the instruction prejudicial. As stated earlier, the facts of the case amply support the trial judge's determination.

Defendant also objects to plaintiffs' instruction No. 19 concerning the various charges of negligence, as it contends that there is no proof of such negligence. The charges of negligence to which McDonald's objects are as follows:

> (a) insufficiently trained or instructed employees in safe and proper closing procedures;

> (b) allowed employees to transport garbage to a dumpster located at the rear of the building at night when it was unsafe and dangerous;

> (c) failed to place a required sign on the rear door stating that it must not be opened after dusk;

> (d) failed to equip the rear door with a Detex alarm;

> (e) failed to provide a rear entrance door with sufficient locks, handles and other devices to adequately secure the rear door; and

> (f) failed to warn plaintiffs that criminal activities had occurred at other McDonald's restaurants in the locality.

A review of the trial testimony reveals that there was evidence on every one of the charges of ·negligence which was submitted to the jury. Although some of the evidence may have been conflicting or cir-

cumstantial, it was sufficient to go to the jury, and up to the jury to make a determination of fact.

Defendant also objects to the giving of IPI Civil No. 50.04 modified (plaintiffs' instruction No. 21) and IPI Civil No. 50.05 (plaintiffs' instruction No. 22), and the failure of the court to give defendant's instruction No. 3. These instructions all relate to the issue of agency and Karl Ferret's alleged relationship to defendant McDonald's Corporation. IPI Civil No. 50.05 defines the term "agent," and IPI Civil No. 50.04 instructs the jury that if it finds Karl Ferret to be the agent of McDonald's corporation, then any act of Ferret's may be attributed to defendant McDonald's Corporation. Defendant contends that these instructions were improper because Karl Ferret could not have been its agent, and that, therefore, any agency instructions would have been improper. This issue was also presented to the trial judge in defendant's motion for a directed verdict. The judge determined, and the record supports, his determination that there was sufficient factual testimony (including McDonald's Corporation's direct communications with Ferret and the ability of its executives to demote him, transfer him, or let him go) to submit this issue to the jury. The above instructions are therefore not erroneous.

Defendant's instruction No. 3, which was not given by the trial court, would have informed the jury of the effect of a franchise agreement on an agency relationship. The jury would have been told that it could consider the right of the franchisor to control the operation of the franchisee. It also would have been informed as to what controls the franchisor could exercise without establishing an agency relationship. Defendant claims that the failure of the court to give such an instruction deprived it of a defense to the finding of an agency relationship between McDonald's Corporation and Karl Ferret. Even if the court had given this instruction, the control which McDonald's exercised over Ferret was so great (the ability to demote him, transfer him, or let him go) that a finding of agency would still be supported by the evidence, notwithstanding the franchise agreement. Moreover, the failure of the court to give the franchise instruction did not prejudice defendant, as McDonald's was held liable for its own negligence in failing to carry out its assumed duty, rather than simply because Ferret as an agent of the franchisee also failed to perform with due care.

Thus, we find that there was no trial court error which would entitle defendant to a judgment notwithstanding the verdict, or in the alternative, a new trial. We affirm the trial court's determination of defendant McDonald's negligence and its award of damages to the

parents of Laura Martin for their daughter's wrongful death, and to Maureen Kincaid and Therese Dudek for the negligent infliction of emotional distress.

Judgment affirmed.

LORENZ, P.J., and MURRAY, J., concur.