EMMANUEL CASTRO, Adm'r of the Estate of Michael Castro, Deceased, *et al.*, Plaintiffs-Appellants and Cross-Appellees, v. BROWN'S CHICKEN AND PASTA, INC., Defendant-Appellee and Third-Party Plaintiff (The Cook County State's Attorney's Office, Intervenor and Cross-Appellant; Ehlenfeldt Enterprises, Inc., Third-Party Defendant).

First District (4th Division)   No. 1—99—0888

Opinion filed June 15, 2000.

Terrence E. Leonard, of Chicago, for appellants.

Cassiday Schade & Gloor, of Chicago (Bruce M. Wall and Donald F. Ivansek, of counsel), for appellee Brown's Chicken & Pasta, Inc.

Richard A. Devine, State's Attorney, of Chicago (Maureen E. Mulvenna, Assistant State's Attorney, of counsel), for intervenor Cook County State's Attorney's Office.

Hinshaw & Culbertson, of Chicago (Stephen R. Swofford, David H. Levitt, and Christine L. Olson, of counsel), for Ehlenfeldt Enterprise, Inc.

Thomas R. Burney, Glenn C. Sechen, and James R. Griffin, all of Schain Burney Ross & Citron, Ltd., of Chicago, for Village of Palatine.

JUSTICE SOUTH delivered the opinion of the court:

On January 8, 1993, at approximately 9 p.m., one or more persons entered the Brown's Chicken & Pasta, Inc. (Brown's), restaurant in

Palatine, Illinois, and murdered seven people. The franchisees, Mr. and Mrs. Ehlenfeldt, had just entered into a franchise agreement with Brown's approximately six months prior on May 29, 1992. The victims of the crime, the Ehlenfeldts, Michael Castro, Rico Solis, Guadalupe Maldonado, Thomas Mennes and Marcus Nellsen, were discovered at approximately 3 a.m. by a Palatine police officer. No one has been charged with these murders, and the investigation is ongoing. A task force, which consists of law enforcement officers from various state and federal jurisdictions, the Cook County State's Attorney's office, seven full-time investigators, and two part-time Federal Bureau of Investigation staff members, was formed for the purpose of solving this crime.

On January 6, 1995, Emmanuel Castro, as administrator for the estate of his deceased son, Michael Castro, filed suit against Brown's alleging that Brown's exercised control over the franchisee by virtue of the franchise agreement and by recommending safety rules for the employees. Brown's filed a motion to dismiss the complaint alleging that the plaintiff had failed to allege a "voluntary undertaking." On June 29, 1995, Judge Hogan dismissed the wilful and wanton counts of the plaintiff's complaint (counts III and IV) and gave plaintiff leave to amend to include a cause of action for a "voluntary undertaking to provide safety."

On January 8, 1996, Evelyn Urgena was appointed administrator for the estate of Rico Solis and a second lawsuit was filed against Brown's. This complaint was essentially the same as the Castro complaint, and the two cases were consolidated on March 21, 1996.

During the course of discovery, Brown's subpoenaed the Village of Palatine's (the Village) records on the crime, and the Village moved to quash, arguing that the subpoena was vague, overly broad and subject to an investigatory privilege. On October 4, 1995, the court ruled in favor of the Village. Brown's subsequently filed a second subpoena, narrowing the requests, and the Village again moved to quash. On January 9, 1996, the judge ordered the Village to produce certain items and provided for a protective order on anything that the Village did produce.

The Cook County State's Attorney's office petitioned to intervene and moved to quash the subpoena served by Brown's on the Cook County medical examiner. The court allowed intervention but denied the motion.

During discovery, Brown's produced numerous documents, including a franchise agreement which is relied upon by both parties. Brown's specifically points to the "Independent Contractors/ Indemnification" clause within the agreement, which provides, "nor

shall Brown's be obligated for any damages to any person *** directly or indirectly arising out of the operation of the store or franchisee's business conducted hereunder, whether caused by franchisee's negligence or willful action or failure to act." Plaintiffs also point to various provisions within the agreement in support of their position. Section 10, entitled "Specifications, Standards, Procedures and Rules," states in pertinent part that "franchisee agrees to comply fully with all mandatory specifications, standards, operating procedures, and rules from time to time prescribed by Brown's *** including, without limitation, specifications, standards, operating procedures and rules pertaining to: (1) safety." Section 20 of the agreement, entitled "Termination of Franchise," states: "Brown may terminate this agreement *** if franchisee, the store or the principal owner or owners of the equity or operating control of franchisee: *** operates the store in a manner that presents a health or safety hazard to its customers, employees or the public."

Brown's also presented Mary Childers, the director of franchise services for Brown's, for deposition. Ms. Childers conducted routine quality inspections for the franchise stores to monitor compliance with Brown's guidelines and to answer questions that employees might have. She visited the Palatine store at least once a month and would conduct her inspections based upon a preprinted quality inspection checklist. Out of the six inspections conducted after the Ehlenfeldts took over ownership of the Palatine store, Ms. Childers noted on one of the inspection sheets that the back door of the store was not locked and that this was bad for security and health. She testified that the reason she made that notation was because there was always a concern about employee theft. She also stated that there were state health regulations against open doors and windows in restaurants. Ms. Childers testified at her deposition that she did not inspect the stores for security but for safety. She was only concerned with safety as it related to food items and slip and fall hazards, and her inspections did not include anything related to crime prevention.

John Gregornik, the owner of the Palatine franchise prior to the Ehlenfeldts, was also deposed. Mr. Gregornik owned up to six franchise stores at one time. He testified that there is a distinct difference between company-owned stores and franchises; that the franchisees developed their own policies and procedures; that memos from the corporation were often disregarded altogether; and that he was free to run his restaurants the way he saw fit and to implement any security measures he deemed necessary.

On December 17, 1996, Brown's filed a motion for summary judgment. Attached to the motion was an affidavit by Michelle Hudak, the

director of training and human resources for Brown's. In that affidavit, Ms. Hudak stated that Brown's did not mandate any security measures for the franchisees, did not provide the franchisees with any written materials dealing with the issue of security, and did not employ any security personnel for the franchisees, and any security measures were left entirely up to the franchisees' discretion. Plaintiffs responded and attached a memo from Ms. Hudak dated November 25, 1992, which was sent to all Brown's company-owned stores, as well as to the owners of franchise stores. The memo stated in part:

"Each year, we see an increase in robberies at this time of year. Losing the money is one thing, but more importantly, our reputation for having only small quantities of money in the store must be maintained so potential robbers will regard us as poor targets. Therefore, please examine your deposit and security procedures and make certain there is no more than a minimal amount of money in the store at one time.

Attached is a list of security procedures that will make your store less attractive to a robber. *Implement immediately*.

Let's work together to make Brown's Chicken & Pasta a safe and pleasant place to work." (Emphasis in original.)

On August 6, 1997, Judge Hogan denied Brown's motion for summary judgment. Brown's filed a motion to reconsider the motion for summary judgment, which was denied as to the issue of "voluntary undertaking" and granted as to the issue of proximate cause. On February 5, 1999, Judge Hogan granted Brown's renewed motion for summary judgment on the issue of proximate cause, but denied the motion with regard to the voluntary undertaking issue. He also denied plaintiffs' motion to compel discovery from investigating bodies or agencies, quashed their motion for subpoenas, denied the State's Attorney's motion to stay and later amended the order to include Rule 304(a) (134 Ill. 2d R. 304(a)) language. Plaintiffs' notice of appeal was filed on March 5, 1999. In addition to Brown's response to plaintiffs' appeal, Ehlenfeldt Enterprises, Inc., the Cook County State's Attorney's office, and the Village of Palatine and its task force have also filed responses to plaintiffs' brief.

The issues raised on appeal are (1) whether Brown's voluntarily undertook to provide security at the Palatine restaurant; (2) whether the circuit court erred in denying plaintiffs' discovery requests on the issue of proximate cause and then entering summary judgment against the plaintiffs on the basis that plaintiffs had not and could not prove that element; and (3) whether the State's Attorney and the Village of Palatine made a sufficient showing to invoke an investigative privilege.

■ In order to recover on a theory of negligence, the plaintiff must show that the defendant owed him a duty, that the defendant breached that duty, that he suffered injury as a result of that breach and that defendant's breach of duty or negligence was the proximate cause of his injuries. *Martin v. McDonald's Corp.*, 213 Ill. App. 3d 487, 490, 572 N.E.2d 1073, 1076 (1991). The question of duty, the legal obligation imposed upon one for the benefit of another, is a question of law to be determined by the court. *Martin*, 213 Ill. App. 3d at 490, 572 N.E.2d at 1076. If no legal duty exists based upon a "special relationship" between the plaintiff and the defendant, liability can also be imposed on the defendant for negligent performance of a voluntarily undertaking.[1] *Martin*, 213 Ill. App. 3d at 490, 572 N.E.2d at 1076.

Clearly, there is no legal duty on the part of Brown's because no special relationship exists between it and plaintiff. Therefore, the issue becomes whether Brown's was negligent in voluntarily undertaking to provide security for the plaintiffs. Whether a defendant has voluntarily undertaken a legal duty to a plaintiff seeking to bring a negligence action is a question of law that is properly addressed by the court on a motion for summary judgment. *Lavazzi v. McDonald's Corp.*, 239 Ill. App. 3d 403, 409, 606 N.E.2d 845, 851 (1992).

■ Section 324A of the Restatement (Second) of Torts provides in pertinent part:

"One who undertakes *** to render services to another which he should recognize as necessary for the protection of a third person *** is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking." Restatement (Second) of Torts § 324A (1965).

■ However, under the voluntary undertaking doctrine of liability, the duty of care to be imposed upon the defendant is limited to the extent of the undertaking. *Frye v. Medicare-Glaser Corp.* 153 Ill. 2d 26, 32, 605 N.E.2d 557, 563 (1992).

In *Frye*, the Illinois Supreme Court reversed an appellate court de-

---

[1] "Special relationships" that have been recognized by the courts have been common carrier/passenger, innkeeper/guest, possessor of land/member of the public, or one who had custody of another who is deprived of the opportunity to protect himself.

cision and granted summary judgment in favor of defendants. *Frye*, 153 Ill. 2d 26, 605 N.E.2d 557. The court reasoned that, although defendants voluntarily placed drowsiness warnings on plaintiff's prescription, they did not assume the responsibility to warn decedent of all possible dangers and side effects related to the taking of the medication. *Frye*, 153 Ill. 2d at 29, 605 N.E.2d at 560. Plaintiff argued that the drowsy-eye label was inadequate to warn of the real dangers of the side effects associated with Fiorinal, namely, drinking alcohol while taking the drug, and that one would be misled into thinking that the worst side effect one could anticipate was drowsiness. *Frye*, 153 Ill. 2d at 30-31, 605 N.E.2d at 561. However, the court reasoned that, the "plaintiff has taken an overly broad interpretation of the defendants' undertaking." *Frye*, 153 Ill. 2d at 33, 605 N.E.2d at 560. The extent of the defendants' undertaking was to warn of possible drowsiness associated with the drug, which they undertook with reasonable care.

In *Kolodziejzak v. Melvin Simon & Associates*, 292 Ill. App. 3d 490, 685 N.E.2d 985 (1997), reversing a lower court decision, the appellate court held that defendant was not negligent in conducting follow-up on its security company or in failing to hire additional guards. In *Kolodziejzak*, defendant entered into a one-year contract with a strip mall, Yards Plaza, to provide security to the common areas of the plaza and prepared daily reports that were submitted to the on-site operations manager. *Kolodziejzak*, 292 Ill. App. 3d at 491, 685 N.E.2d at 986. While attempting to apprehend a shoplifter, Kolodziejzak, a loss prevention specialist employed by one of the mall's tenants, was fatally shot by a shoplifter. Refusing to apply the reasoning in *Martin*, the court held that the only duty defendant undertook was the duty to review daily log reports, and this duty was adequately performed.

In *Martin*, a case relied upon by plaintiffs, a robbery and murder took place after closing at a McDonald's restaurant. *Martin*, 213 Ill. App. 3d at 489, 572 N.E.2d at 1076. In that case, the court concluded that by the licensor's control of the licensee's security procedures defendant voluntarily undertook to provide for the security of its licensee's employees and, therefore, a duty to provide security arose. *Martin*, 213 Ill. App. 3d at 492, 572 N.E.2d at 1078. The court reasoned that, although there was no legal duty to protect plaintiffs against the criminal acts of third parties, there was a voluntary undertaking by defendant's regional security supervisor, who acted directly as the security supervisor for the licensee. The licensee did not have an operations manager or security manager of its own, and defendant provided detailed, mandatory security measures to be followed by the licensee's employees. It created a branch of its corporation assigned to deal with

security problems and even prepared a security bible for the benefit of the licensee. Additionally, McDonald's also communicated to the store management what the security policies were and followed up with the licensee to make sure that all problems were corrected. *Martin*, 213 Ill. App. 3d at 491, 572 N.E.2d at 1078. Based upon these facts, including testimony at trial, the appellate court concluded that a duty had been created by the defendant's voluntary undertakings. *Martin*, 213 Ill. App. 3d at 493, 572 N.E.2d at 1078.

A similar conclusion was reached in *Nelson*, where the Illinois Supreme Court held that defendant insurance company's gratuitous safety inspections and safety engineering services with respect to a hoist on a construction site gave rise to a duty to plaintiff construction workers. *Nelson v. Union Wire Rope Corp.*, 31 Ill. 2d 69, 83, 199 N.E.2d 783 (1964). Seven of the plaintiffs were killed and thirteen others severely injured when the hoist cable broke and the plaintiffs plunged six floors to the ground. *Nelson*, 31 Ill. 2d at 71, 199 N.E.2d at 783. The *Nelson* court concluded that there was a voluntary undertaking because: (1) defendant had repeatedly advertised that it provided safety engineering services that could increase an insured's worker safety and lower an insured's costs; (2) defendant's safety engineer made frequent safety inspections, which included careful inspection of the hoist; (3) defendant's safety engineer filed reports of his safety inspections with defendant and the insured, and the reports specifically mentioned the hoist and sometimes included recommendations for changes to improve safety; and (4) the insured relied on defendant's safety inspections and did not employ a safety engineer or safety inspector of its own. *Nelson*, 31 Ill. 2d at 79-83, 199 N.E.2d at 779-83.

In the case at bar, the acts on the part of Brown's do not rise to the level of the "voluntary undertaking" assumed by defendants in *Martin* or *Nelson*, nor do they satisfy the required elements under the Restatement (Second) of Torts. The facts of this case, as well as all of the supporting depositions, affidavits and pleadings on file, support summary judgment in favor of Brown's as to the duty issue. See also *Decker v. Domino's Pizza, Inc.*, 268 Ill. App. 3d 521, 644 N.E.2d 515 (1994) (appellate court found voluntary undertaking on the part of defendant for establishing a security program to deter robbery and to protect its employees from harm in the event of a robbery by establishing a protective services department, setting up a hotline for security-related matters, setting up a committee to review security matters, and making it mandatory for both corporate and franchise stores to use the case management system and time-delay safe). Once again, the essential element of the voluntary undertaking doctrine is an undertaking, and the duty imposed upon defendant is the extent of that undertaking. *Decker*, 268 Ill. App. 3d at 526, 205 N.E.2d at 520.

Plaintiffs argue that Brown's voluntary undertaking was evidenced by several factors, such as Ms. Hudak's November 25, 1992, memo to all store owners and several provisions contained in the purchase agreement. Plaintiffs allege that these factors demonstrate that Brown's had control over the franchisee and voluntarily undertook the responsibility of providing security for the Palatine location. Plaintiffs' position is incorrect.

Although Ms. Hudak sent a letter regarding security to all stores, including the franchise stores, she testified in her deposition that Brown's did not mandate any security measures to be followed by the franchisees, they did not provide the franchisees with any written materials dealing with the issue of security, and they did not employ any security personnel for the franchisees. She further testified that all security measures were left entirely up to the franchisees' discretion.

Ms. Childers, the director of franchise services for Brown's Chicken, testified in her deposition that although she did conduct routine quality inspections at the franchise stores, she did not inspect the stores for security purposes but for food safety purposes only. She stated it was against state health regulations for there to be open doors and windows in restaurants. She was only concerned with safety as it related to food items and slip and fall hazards, and her inspections did not include anything related to crime prevention. She explained during her deposition that the reason she included a statement about the door of the franchise being unlocked on one of her checklists was because there was always a concern about employee theft.

Mr. Gregornik, the owner of the Palatine franchise prior to the Ehlenfeldts and an owner of up to six franchises at a time, testified that there is a distinct difference between company-owned stores and franchises and that the franchisees develop their own policies and procedures with respect to security at their restaurant, including training the employees on security procedures. He further testified that memos from the corporation were often disregarded altogether and that he was free to run his restaurants as he saw fit and to implement any security measures he deemed necessary.

Furthermore, the evidence from the police investigation suggests that the assailant probably gained entry during the restaurant's hours of operation, ordered a meal, and remained there until the restaurant closed. As such, even if Brown's had voluntarily assumed a duty to the decedents, this duty would have been limited to the extent of the undertaking—to follow up on the memo sent out by Ms. Hudak to make sure that the security procedure she suggested, *i.e.*, "keeping

the back door locked," was implemented. If, however, the assailant gained entry by means other than through this unlocked door, no duty assumed by Brown's was breached.

With respect to the franchise agreement, plaintiffs argue that several of the terms prove that Brown's had control over the franchisee's day-to-day operations, including security. The section entitled "Specifications, Standards, Procedures and Rules" states in pertinent part that the "franchisee agrees to comply fully with all mandatory specifications, standards, operating procedures, and rules from time to time prescribed by Brown's *** including, without limitation, specifications, standards, operating procedures and rules pertaining to: (1) safety." The section entitled "Termination of Franchise" states in pertinent part that "Brown may terminate this agreement *** if franchisee, the store or the principal owner or owners of the equity or operating control of franchisee: *** operates the store in a manner that presents a health or safety hazard to its customers, employees, or the public."

*Coty v. U.S. Slicing Machine Co.*, 58 Ill. App. 3d 237, 239, 373 N.E.2d 1371, 1373 (1978), was the first Illinois Appellate Court case to squarely address the issue of whether a franchisor's ability to terminate a contract was enough to constitute control over the franchisee's day-to-day activities and, therefore, impose liability on the franchisor for the actions of the franchisee. In that case, a 15-year-old girl who was injured while operating a meat slicing machine at the franchisee's restaurant sued based upon a theory of negligence. *Coty*, 58 Ill. App. 3d at 239, 373 N.E.2d at 1373. The appellate court held that, although based upon the franchise agreement, the franchisor could have requested that franchisee stop employing children to do that particular type of work or terminated the entire agreement if the franchisee failed to do so. The provision was insufficient to subject the franchisor to liability based upon agency or employer-independent contractor cases. *Coty*, 58 Ill. App. 3d at 241-42, 373 N.E.2d at 1375. The "mere reservation of 'a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed *** does not mean that the contractor is controlled as to his methods of work, or as to operative detail.' [Citations.] *** [The] right to interdict unsafe practices must consist of something more than a general right to make suggestions or recommendations or to order the work stopped or resumed." *Coty*, 58 Ill. App. 3d at 241-42, 373 N.E.2d at 1375.

The Illinois courts have consistently followed the reasoning in *Coty* and have refused to impose liability on the defendant in franchisor-franchisee cases where the franchisee has retained total control over its own day-to-day operations, despite language in the

agreement that gives the franchisor a right to rescind the contract. See *Lavazzi*, 239 Ill. App. 3d 403, 606 N.E.2d 845 (the court followed the reasoning in *Coty* that a right to rescind a contract or call off work is generally insufficient to establish control and impose liability for workers' safety); *Yassin v. Certified Grocers of Illinois, Inc.*, 150 Ill. App. 3d 1052, 502 N.E.2d 315 (1986) (defendant cannot be held liable under a principal-agent theory since plaintiff's father and her uncle both testified that they exercised day-to-day control over their store and they alone had the power to hire and fire employees).

■ In this case, nothing in the record supports the conclusion that Brown's controlled the franchisee's day-to-day operations in any way. Unlike the defendants in *Martin*, *Nelson* and *Decker*, Brown's did not implement mandatory security measures to be followed by the franchisee, it did not follow up to make sure that security recommendations were followed, it did not provide security for the Palatine restaurant or engage in routine security checks, and it did not set up a security hotline or a committee to review security measures. *Martin*, 213 Ill. App. 3d at 491-92, 572 N.E.2d at 1078; *Nelson*, 31 Ill. 2d at 79-83, 199 N.E.2d at 779-83; *Decker*, 268 Ill. App. 3d at 526, 205 N.E.2d at 520.

In addition, the purchase agreement also makes it clear that the franchisee was in control of the restaurant. Several provisions within the agreement were stricken by the parties, such as the section entitled "TRAINING" and "STORE OPENING." Furthermore, the first sentence of section 24 of the agreement, entitled "INDEPENDENT CONTRACTORS/ INDEMNIFICATION," states: "Brown and Franchisee are independent contractors." Finally, as Brown's points out in its response, there are no provisions within the agreement regarding the security of the store, nor is there any provision stating that Brown's is responsible for that security.

Therefore, it is the opinion of this court that Brown's did not voluntarily undertake to provide security for the Palatine location, and summary judgment should have been granted in favor of Brown's on the issue of duty. Although the court was incorrect as to that particular issue, we may affirm the decision of the trial court to grant summary judgment on any basis in the record, regardless of whether it relied on that ground or whether its reasoning was correct. *Grot v. First Bank of Schaumburg*, 292 Ill. App. 3d 88, 93 (1997).

The next issue we address is the court's denial of plaintiffs' discovery requests on the issue of proximate cause and its entry of summary judgment against plaintiffs on the basis that they could not prove that element.

■ "Proximate cause" exists when injury to the plaintiff is the

natural and probable result of a negligent act or omission of the defendant. *N.W. v. Amalgamated Trust & Savings Bank*, 196 Ill. App. 3d 1066, 1076, 554 N.E.2d 629, 636 (1990). Ordinarily, the issue of proximate cause is a question of fact. However, when the facts are undisputed, this issue becomes a question of law. *N.W.*, 196 Ill. App. 3d at 1076, 554 N.E.2d at 636. The element of proximate cause must be established to a reasonable certainty, and no finding can be based upon mere speculation, guess, surmise or conjecture. *Wilson v. Bell Fuels*, 214 Ill. App. 3d 868, 875-76, 574 N.E.2d 200, 203 (1991). If, upon all the evidence contained in the record, it cannot be established with reasonable certainty that defendant's acts caused plaintiff's injury, summary judgment is appropriate. *N.W.*, 196 Ill. App. 3d at 1075-76, 554 N.E.2d at 637.

In *N.W.*, an unknown intruder sexually assaulted the plaintiff after gaining entry to her apartment. Plaintiff brought an action for negligence against the defendant claiming that defendant's negligence was the proximate cause of her injuries. *N.W.*, 196 Ill. App. 3d at 1068, 554 N.E.2d at 631. Plaintiff alleged that defendant knew or should have known that the lock to the rear entrance was broken, that defendant failed to fix the lock, and that this failure was the proximate cause of her injuries. However, based upon the evidence, the other tenants in the building, as well as their guests, had free access to the stairwell that led up to the plaintiff's kitchen door. Therefore, plaintiff could not be reasonably certain that the intruder gained entry to the building by way of the rear entrance. In granting summary judgment in favor of defendant, the court reasoned that a "genuine issue of material fact" means that there is evidence to support the position of the nonmoving party and that there was a reasonable certainty that defendant's acts caused the injury. *N.W.*, 196 Ill. App. 3d at 1075, 554 N.E.2d at 636. The only evidence that could lead to an inference that the assailant gained entry to the building by way of the unlocked back door was that the lock was broken on the night that the plaintiff was sexually assaulted. The court noted that this possible causal connection was insufficient to raise the requisite inference of fact. *N.W.*, 196 Ill. App. 3d at 1075-76, 554 N.E.2d at 637.

■ In this case, even if plaintiffs were to establish that Brown's had voluntarily undertaken to "provide adequate security measures to prevent entrance to the premises after it was closed to the public," as they state in their complaint, they cannot establish that this undertaking was the proximate cause of the murders. According to investigative police reports it is highly likely that the killer gained entry to the restaurant through the front door prior to closing, purchased a meal as a ruse, and remained until after the store was closed. There was

nothing to indicate he gained entry through the unlocked door. Therefore, even if Brown's had assumed a duty to make sure that the doors to the restaurant remained locked after closing, plaintiffs cannot establish with reasonable certainty that a breach of this duty was the proximate cause of the murders.

Plaintiffs cannot point to anything in the record that would "establish to a reasonable certainty" that Brown's alleged voluntary undertaking was the proximate cause of the crime committed at the Palatine restaurant. As the court reasoned in *N.W.*, a genuine issue of material fact means that there is evidence to support the position of the nonmoving party and that there is a reasonable certainty that defendant's acts caused the injury. That has not been established here. The trial court's decision to grant summary judgment in favor of Brown's on the issue of proximate cause was correct.

■ The final issue we address is whether the State's Attorney and the Village of Palatine made a sufficient showing to invoke the investigative privilege.

The trial court has broad discretion in ruling on discovery matters. *Avery v. Sabbia*, 301 Ill. App. 3d 839, 844, 704 N.E.2d 750, 755 (1998). As such, a discovery order will not be disturbed absent an abuse of discretion. *Avery*, 301 Ill. App. 3d at 844, 704 N.E.2d at 755. An abuse of discretion occurs where the trial court acts arbitrarily and fails to employ conscientious judgment and ignores recognized principles of law. *Avery*, 301 Ill. App. 3d 839, 704 N.E.2d 750.

The Illinois Appellate Court has recently recognized the law enforcement investigatory privilege in *In re Marriage of Daniels*, 240 Ill. App. 3d 314, 607 N.E.2d 1255 (1992). This qualified common law privilege applies both to tangible evidence and oral testimony. *Daniels*, 240 Ill. App. 3d at 331, 607 N.E.2d at 1266. Incorporated under Rule 26(b) of the Federal Rules of Civil Procedure, it serves "to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witnesses and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation." *Hernandez v. Longini*, No. 96C6203, slip op. at 9 (U.S. November 10, 1997). In determining whether this privilege applies to a particular case, the court must balance the public benefit of the confidentiality of the law enforcement investigation with the need of a civil litigant to receive such information. *Daniels*, 240 Ill. App. 3d at 331-32, 607 N.E.2d at 1266.

In *Dellwood Farms v. Cargill*, 128 F.3d 1122 (7th Cir. 1997), the seventh circuit held that the investigatory files in an ongoing criminal investigation are privileged and not subject to discovery and that it is

improper for the judiciary to thrust itself into a criminal investigation for the purpose of facilitating a criminal investigation. "The balancing of *** the need of the litigant who is seeking investigative materials— against the harm to the government if the privilege is lifted is *** confided to the discretion of the district judge, meaning that appellate review is deferential." *Dellwood*, 128 F.3d at 1125. Furthermore, both the Illinois and federal Freedom of Information Acts are parallel in their recognition that investigatory files in ongoing criminal investigations should not be disclosed. 5 ILCS 140/7(c)(i) through (c)(viii) (West 1992); 5 U.S.C. §§ 552(b)(7)(A), (b)(7)(D) (1976).

In *Daniels*, the court relied on both state and federal court opinions as well as the Illinois and federal Freedom of Information Acts (FOIA) in recognizing the investigatory privilege. The court noted that although the FOIA exemptions deal with the "disclosure to the public generally, not disclosure in response to discovery in litigation," the relation between discovery procedures and the FOIA is well established. *Daniels*, 240 Ill. App. 3d at 326, 607 N.E.2d at 1263. In determining whether the privilege applied in the *Daniels* case, the court relied on 10 criteria that were used in *Frankenhauser v. Rizzo*, 59 F.R.D. 339 (1973), to conduct the balancing test. However, it is important to note that the court was very clear in *Frankenhauser* that the additional criteria used in that case to conduct the balancing test should primarily be used in civil rights cases. *Frankenhauser*, 59 F.R.D. at 344.[2] Therefore, the correct test in determining whether the privilege should be applied in this case is the balancing test where the court must balance the public benefit of the confidentiality of the law enforcement investigation with the need of a civil litigant to receive such information.

Here, the trial court properly balanced the interests of the government in keeping the information obtained in the murder investigation confidential, against the interests of the plaintiffs. First, the investigation is not complete, and the perpetrator of this crime may still be at large.[3] For this reason alone, it is imperative that the investigation remain confidential. The courts in both *Dellwood* and *Daniels* reasoned that, in an ongoing investigation, the courts should defer to the execu-

---

[2]In that case, the court reasoned that, generally, when considering whether the investigatory privilege should apply, "the court must balance the public interest in the confidentiality of governmental information against the needs of a litigant to obtain data ***. In the context of discovery of police investigation files in a civil rights case, however, at least the following considerations should be examined ***." 59 F.R.D. at 344.

[3]In *Daniels*, the court noted that this factor, whether the investigation is complete, is entitled to significant weight in the balancing process.

tive branch and not interfere in the investigatory process. Second, the protection of the individuals involved in this investigation could be jeopardized if these files are disclosed. Third, if the task force and the Cook County State's Attorney's office are required to disclose this information, the entire investigation could be thwarted, and the ultimate goal of all the parties involved, *i.e.*, the apprehension of the perpetrator, might never be accomplished. Therefore, the trial court's determination that the State's Attorney and the Village of Palatine have made a sufficient showing to invoke the investigative privilege must be upheld.

Based upon the foregoing analysis, the judgment of the circuit court is affirmed.

Affirmed.

HALL and BARTH, JJ., concur.