# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 02-3583

LM, GUARDIAN ON BEHALF OF KM, A MINOR,

*Plaintiff-Appellant,*

*v.*

UNITED STATES OF AMERICA,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 8538—**Joan Humphrey Lefkow**, *Judge.*

———————

ARGUED FEBRUARY 27, 2003—DECIDED SEPTEMBER 24, 2003

———————

Before KANNE, DIANE P. WOOD, and EVANS, *Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* No one can condone the sexual abuse of a young child. Nevertheless, however deplorable such behavior is, the question here is whether someone other than the perpetrator him- or herself is responsible for the resulting injury. Specifically, we must decide whether the United States is liable under the Federal Tort Claims Act (FTCA) for a mail carrier's sexual abuse of

a seven-year-old girl who lived in a home on his mail delivery route. The answer is yes only if the United States Postal Service (USPS or Postal Service) undertook a voluntary, Good Samaritan duty to protect the girl and other children from the mail carrier when it temporarily assigned him to desk duty pending the investigation of earlier sexual abuse allegations, and then if it breached that duty when it later reassigned the mail carrier to a delivery route in a nearby suburb. The district court dismissed the complaint filed by the girl's father on the government's motion, finding a lack of jurisdiction. FED. R. CIV. P. 12(b)(1). Although we feel great sympathy for the child and family involved, we must affirm the district court's judgment.

# I

LM filed a lawsuit invoking the FTCA, 28 U.S.C. §§ 1346, 2671 *et seq.*, after exhausting his administrative remedies by submitting a claim to the USPS, and then filing a written request for reconsideration after his claim was denied. The facts set forth in LM's complaint were properly taken as true by the district court in deciding the government's motion to dismiss. *Transit Express, Inc. v. Ettinger*, 246 F.3d 1018, 1023 (7th Cir. 2001). We do the same on appeal. *Thompson v. Illinois Dep't of Prof'l Regulation*, 300 F.3d 750, 753 (7th Cir. 2000).

From some time prior to 1990 until after August 11, 1998, the USPS employed a mail carrier, Leslie Tucker. Tucker came to be called "Lester the Molester" by his co-workers because of his notorious sexual abuse of the children who lived along his routes. LM is the father and guardian of KM, a minor, who resides in Park Forest, Illinois. He brought this lawsuit on his daughter's behalf, alleging that she was sexually abused by Tucker when she was seven years old. LM claimed that on August 11, 1998, a neighbor observed Tucker lure KM behind his truck where he "re-

peatedly inserted his hands inside her pants, intermittently removing, smelling, and tasting his fingers, before proceeding again numerous times over a period of approximately eight minutes." The neighbor who witnessed these events called 911. Tucker was subsequently prosecuted by the state, pleaded guilty to criminal charges, and was still in prison at the time LM filed his complaint.

According to LM, during the course of Tucker's career with the Postal Service, he sexually abused at least 10 minor girls who ranged in age from two to twelve years old. LM further alleged that the USPS learned of Tucker's inappropriate and criminal conduct toward young girls both through numerous complaints from relatives of his various victims and through notice from the Richton Park police that Tucker was being investigated for sexually molesting a two-year-old girl and a four-year-old girl. LM alleged that at some point in 1990, in response to this information, the USPS removed Tucker from his mail delivery route. During this period Tucker was assigned to desk duty. Some time after 1990, Tucker was reassigned to a postal route. Well before 1998, when the events giving rise to this appeal occurred, the authorities responsible for the Park Forest branch post office were notified by a concerned grandmother that Tucker was a known child molester, and that he was observed delivering mail in Park Forest.

Based on these facts, LM sued, initially claiming that the USPS had negligently hired, screened, and retained Tucker, a known child molester. LM asserted that by removing Tucker from his assigned route, the USPS "assumed responsibility to keep Tucker out of the neighborhoods." When Tucker was subsequently given another delivery route, LM continued, the Postal Service breached "an affirmative duty to protect the public, given its knowledge of Tucker's sexual molestation of children while on his carrier routes." In response to the government's motion to dismiss his complaint, LM disavowed the portion of his complaint that

sought relief for the USPS's negligent hiring, supervision and retention of Tucker. Instead, he confined himself to the argument that USPS was liable because it had breached an affirmative, voluntarily assumed duty to protect the children who lived along Tucker's mail carrier route. The district court, finding no support in Illinois law for LM's claim that the Postal Service undertook a voluntary duty to protect children from harm based on its knowledge of the risk that Tucker may have posed, dismissed LM's complaint.

## II

The U.S. government, like other sovereign entities, enjoys sovereign immunity from liability for its agents' tortious acts. *Doe v. United States*, 838 F.2d 220, 221 (7th Cir. 1988). Congress waived this immunity for a wide range of tort claims when it enacted the Federal Tort Claims Act. *Id.* at 221. The FTCA permits a tort suit against the United States "where injury to person or property is 'caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment.'" *Id.* (quoting 28 U.S.C. § 1346(b)). While this waiver of sovereign immunity is broad, it is not without limit. *Calderon v. United States*, 123 F.3d 947, 948 (7th Cir. 1997) (explaining that "many important classes of tort claims are excepted from the Act's coverage"). For example, the government has not consented to be sued for the intentional torts of its employees and agents. 28 U.S.C. § 2680(h); *Sheridan v. United States*, 487 U.S. 392, 395 (1988). The FTCA contains a jurisdictional limitation that specifies that its "broad grant of jurisdiction 'shall not apply to . . . [a]ny claim arising out of assault, battery' or other specified intentional torts." 487 U.S. at 398 (quoting 28 U.S.C. § 2680(h)) (alterations in original).

The so-called "assault and battery" exception to the FTCA has been the subject of judicial and scholarly interpretation

because the phrase "arising out of assault, battery" is susceptible to both a broad and narrow interpretation. *Id.* at 399-400 (citing Note, *Section 2680(h) of the Federal Tort Claims Act: Government Liability for the Negligent Failure to Prevent an Assault and Battery by a Federal Employee*, 69 GEO. L.J. 803, 822-25 (1981)); *Senger v. United States*, 103 F.3d 1437, 1441-42 (9th Cir. 1996); see also Rebecca L. Andrews, Note, *So the Army Hired an Ax-Murderer: The Assault & Battery Exception to the Federal Tort Claims Act Does Not Bar Suits for Negligent Hiring, Retention and Supervision*, 78 WASH. L. REV. 161, 168-70 (2003); Geri Ann Benedetto, Note, *Torts—The Talismanic Language of Section 2680(h) of the Federal Tort Claims Act*, 60 TEMP. L.Q. 243 (1987). As the Court explained in *Sheridan*, this phrase could be interpreted literally as a bar to recovery for any claim that originates in an assault or battery, but it need not be. 487 U.S. at 400. And the phrase offers little guidance where a plaintiff seeks to recover for the government's ordinary negligence when it occurs in conjunction with an employee's assault or battery. *Id.* Despite this ambiguity, a majority of the Court in *Sheridan* believed that § 2680(h) should not be interpreted so broadly that it serves as a bar against relief where a plaintiff demonstrates that the government, in violation of a duty it owed to the victim, negligently allowed an intentional tort to occur independently of its employment relationship with the tortfeasor. *Id.* at 401-02; see also *Leleux v. United States*, 178 F.3d 750, 757 (5th Cir. 1999) ("*Sheridan* stands for the principle that negligence claims related to a Government employee's § 2680(h) intentional tort may proceed where the negligence arises out of an independent, antecedent duty unrelated to the employment relationship between the tortfeasor and the United States.").

LM relies heavily on *Sheridan* and *Doe* in support of his claim that the USPS breached a duty that it owed his daughter that was unrelated to its employment relationship

with Tucker. In *Sheridan*, an off-duty member of the military injured the plaintiff when he fired shots at the plaintiff's car as the plaintiff drove by the Bethesda Naval Hospital. *Id.* at 393-94. The Court found the government liable for the plaintiff's injuries because earlier in the evening several naval corps members found the off-duty serviceman drunk and in possession of a loaded rifle, both in violation of navy rules. Their subsequent failure to take any steps to alert base authorities that the serviceman was drunk and wielding a gun, combined with the Navy's voluntary decision to draft rules under which such conduct was prohibited, formed the basis of the government's tort liability. As the Court explained: "the negligence of *other* Government employees who allowed a foreseeable assault and battery to occur may furnish a basis for Government liability that is entirely independent of Carr's [the off-duty Naval corps member] employment status." *Id.* at 401 (emphasis added). The Court distinguished the source of liability in the case before it from the hypothetical case in which an off-duty member of the military commits an intentional tort that the government (or, as in *Sheridan*, its agents) has done nothing to try to prevent. *Id.*

Four Justices, including Justice White, joined Justice Stevens's majority opinion in *Sheridan*. Justice White also filed a separate concurring opinion and Justice Kennedy (as a sixth vote) concurred in the Court's judgment. Justice White's one-paragraph concurrence expressly disavowed the position that he had taken three years earlier when he joined then-Chief Justice Burger's plurality opinion in *United States v. Shearer*, 473 U.S. 52 (1985). In a section of the *Shearer* opinion that commanded the votes of only four justices, Chief Justice Burger had advocated a very broad interpretation of the assault and battery exception, stating:

> Respondent cannot avoid the reach of § 2680(h) by framing her complaint in terms of negligent failure to

> prevent the assault and battery. Section 2680(h) does not merely bar claims *for* assault or battery; in sweeping language it excludes any claim *arising out of* assault or battery. We read this provision to cover claims like respondent's that sound in negligence but stem from a battery committed by a Government employee. Thus "the express words of the statute" bar respondent's claim against the Government.

473 U.S. at 55. The majority in *Sheridan* rejected this position. It concluded instead that the government's consent to suit under the FTCA extends to cases claiming an injury that is in part the result of an intentional tort, so long as the government negligently allowed the independent tort to occur in a way that is "entirely independent of [the tortfeasor's] employment status." 487 U.S. at 401. This court's earlier decision in *Doe v. United States*, 838 F.2d 220, *supra*, is consistent with *Sheridan.*

*Doe* involved the sexual abuse of young children in a government-run child-care facility. In that case, the facts did not conclusively establish that employees of the facility had abused the children. The *Doe* court accordingly concluded that the harm was visited upon the children by an act of negligence independent of the employment relationship between the government and the day-care providers. We drew a distinction between cases involving harms that result from a breach of a duty that the government assumed prior to the actual assault, which are actionable under the FTCA, 838 F.2d at 223, and cases such as *Shearer*, in which "the alleged duty of the government to the victim arises only at the time of the assault and because of the assault." Only the latter cases fall within the exception to the waiver of immunity created by the FTCA. *Id.* See *Sheridan*, 487 U.S. at 401-02.

*Sheridan* and *Doe* make clear that there is no *respondeat superior* liability under the FTCA for garden-variety inten-

tional torts. *Sheridan*, 487 U.S. at 401; *Doe*, 838 F.2d at 224. LM has evidently recognized this, as he has abandoned the portion of his complaint that sought relief for the ultimate assault based on USPS's negligent hiring, retention and supervision of Tucker. It is perhaps worth noting that a different district court also dismissed a complaint alleging (on behalf of a different child) that USPS was guilty of negligent hiring, supervision and retention of Tucker, for failure to state a claim. See *Ryan v. United States*, 156 F. Supp. 2d 900 (N.D. Ill. 2001). With negligent hiring, supervision and retention off the table, in order to invoke the court's jurisdiction under the FTCA, LM had to allege facts that if proven at trial would establish that the USPS voluntarily undertook to protect his daughter from Tucker's abuse and then negligently performed that duty prior to her actual assault. As the FTCA commands, we turn to Illinois law to resolve these questions. See 28 U.S.C. § 1346(b)(1) (adopting "law of the place where the act or omission occurred"); *Stratmeyer v. United States*, 67 F.3d 1340, 1345 (7th Cir. 1995); *Midwest Knitting Mills, Inc. v. United States*, 950 F.2d 1295, 1297 (7th Cir. 1991).

Illinois recognizes an affirmative duty of care independent of a special relationship (which LM does not argue exists between the USPS and his daughter) where a voluntary undertaking is shown. See *Rhodes v. Illinois Central Gulf R.R.*, 665 N.E.2d 1260, 1273 (Ill. 1996). The Illinois Supreme Court has on several occasions clarified the voluntary undertaking theory of tort liability. As early as *Nelson v. Union Wire Rope Corp.*, 199 N.E.2d 769 (Ill. 1964), and as recently as *Wakulich v. Mraz*, 785 N.E.2d 843, 854 (Ill. 2003), the state Supreme Court has considered whether a defendant's actions were sufficient to impose a duty upon it that it then negligently performed. In the state court's view, whether a voluntary undertaking has been assumed is necessarily a fact-specific inquiry. For example, in *Nelson*, the court found that the evidence supported the

conclusion that an insurance company's gratuitous safety inspections were not "solely for its own internal purposes," 199 N.E.2d at 776, and concluded that the various inspections and reports were "directed to the safety of the employees on the project." *Id.* at 778. The evidence was easily sufficient to permit a jury to conclude that the defendant's safety inspector negligently performed his voluntarily undertaken duty to inspect a piece of construction equipment. *Id.* at 784. Relying on this negligent performance of a voluntary undertaking, the court held that a jury could find the insurance company liable for the deaths and injuries that resulted when a temporary construction hoist snapped and caused 19 construction workers to plunge six floors down. *Id.* Although *Nelson* applied Florida law, the Supreme Court of Illinois has cited it with approval. See, *e.g.*, *Vesey v. Chicago Housing Auth.*, 583 N.E.2d 538, 543 (Ill. 1991); *Cross v. Wells Fargo Alarm Servs.*, 412 N.E.2d 472, 474 (Ill. 1980). Other cases in which the court has found a voluntary undertaking involve facts where the defendant undertook to provide assistance and then did so negligently, *Wakulich*, 785 N.E.2d at 854 (finding voluntary assumption of duty to care for young woman who became unconscious after consuming quart of alcoholic beverage); or the defendant voluntarily undertook to provide security services in a public housing facility, and then did so negligently. *Cross*, 412 N.E.2d at 474-75 (finding housing authority's voluntary assumption of duty to provide guard services obligated it "to use reasonable care not to create increased dangers to persons lawfully on its property").

Once a voluntary undertaking exists, it must be performed with reasonable care. *Rowe v. State Bank of Lombard*, 531 N.E.2d 1358, 1365 (Ill. 1988). Illinois relies on §§ 323 and 324 of the Restatement (Second) of Torts to assess when a breach of a voluntary undertaking has occurred. *Wakulich*, 785 N.E.2d at 855-56. Specifically, § 324A establishes liability for breach of a voluntary

undertaking if: (1) a party undertakes to do something and then fails to exercise reasonable care in a way that increases a third party's risk of harm; (2) undertakes to perform a duty that a different party was obligated to perform and then negligently fulfills its duty; or (3) a third party relies to its detriment on the fact that a duty has been voluntarily undertaken.

The United States contends that LM cannot establish that the Postal Service assumed a voluntary duty to protect KM when it assigned Tucker to a desk position in 1990. It is also the government's position that even if we find that the USPS assumed such a duty when it stripped Tucker of his mail carrier duties, that duty was not breached several years later when Tucker was assigned to a mail route in Park Forest. While we certainly hope that Tucker was not released upon the community as a known sexual predator, we agree with the district court that knowledge of the risk that Tucker may have posed, without more, is not enough to permit an inference that USPS's act of assigning him to a desk job was at the same time a voluntary undertaking perpetually to protect the local children from him. Even though we must assume at the motion to dismiss stage that the USPS did in fact remove Tucker from his original route while he was being investigated by the Richton Park police, we simply cannot agree with LM that the procedural posture of this case warrants the further assumption that Tucker was removed from his route in order to protect children from abuse. Moreover, there is also nothing in the record to suggest that the reassignment was intended to be permanent, or that USPS communicated any such undertaking to the community.

Not only has LM not cited any case that supports his position that knowledge of a risk, together with the reassignment of a worker, imposes an affirmative duty, but his argument is foreclosed by a decision of the Supreme Court of Illinois. In *Frye v. Medicare-Glaser Corp.*, 605 N.E.2d 557

(Ill. 1992), the court refused to find that a pharmacist had a duty to warn plaintiff's decedent of the risk of consuming alcohol while taking a certain prescription drug simply because the pharmacist both knew of that and other risks that the drug posed and chose only to warn the decedent that the drug may cause drowsiness. *Id.* at 560-61. *Frye* makes clear that a voluntary undertaking is just that—voluntary—and as such, the scope of the duty that is assumed is limited to the extent of the undertaking. *Id.* at 561; *Castro v. Brown's Chicken & Pasta, Inc.*, 732 N.E.2d 37, 42 (Ill. App. Ct. 2000) ("Under the voluntary undertaking doctrine of liability, the duty of care to be imposed upon the defendant is limited to the extent of the undertaking."). LM's complaint asks us to find that the Postal Service's act of reassigning Tucker amounted to a voluntarily assumed duty to protect local children. But that act might have been motivated by a number of considerations, including the desire to permit time for investigation of the charges, protection of Tucker's due process rights pending that investigation, as well as protection of children in case the allegations turned out to be well founded. A finding that the simple reassignment was enough to create liability would have the undesirable effect of discouraging the Postal Service (or any government entity) from taking precautionary steps in the first place. *Frye*, 605 N.E.2d at 560 ("[I]f we were to hold that by choosing to place the 'drowsy eye' label on Frye's prescription container defendants were assuming the duty to warn Frye of all of Fiorinal's side effects, we believe that pharmacists would refrain from placing warning labels on containers.").

The district court did not reach the related question whether the USPS negligently performed its voluntary undertaking because it found no duty in the first instance. Nonetheless, we should point out that LM would face a serious hurdle in the test spelled out in § 324A of the Restatement (Second) of Torts (which Illinois follows) before

he could prove breach of a voluntary duty. To establish negligent performance of a voluntary undertaking under the Restatement, LM would have to prove that the Postal Service's reassignment of Tucker to a delivery route in Park Forest either: (1) increased the risk of harm that the children faced; (2) relieved a third party of its duty to protect the children who were then left without any protection; or (3) caused the children to suffer harm in reliance on the voluntary undertaking. *Frye*, 605 N.E.2d at 560. We do not see how LM could establish any element of this test.

## III

The judgment of the district court is AFFIRMED.

A true Copy:

     Teste:

 

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*