OPINION
{¶ 1} Appellants, Jon and Michelle Fishpaw, individually and on behalf of their minor child Claire Fishpaw, appeal the August 4, 2005 judgment entry of the Franklin County Court of Common Pleas. The trial court's entry formally journalized its July 18, 2005 decision, which granted summary judgment in favor of appellee, Action for Children, and denied appellants' cross-motion for partial summary judgment. For the reasons that follow, we affirm the decision of the trial court.
 {¶ 2} The essential facts of this case are not in dispute. Action for Children ("AFC") is a local non-profit organization that helps families find childcare resources by supplying information about childcare providers to parents upon request. As explained in the brochure provided to interested families, entitled "Take the Time: Choosing Child Care," AFC is "a child-care referral service [that] provide[s] families a connection to child-care resources, which include home care providers, child-care centers, preschools, and school-age programs." AFC does not actually render any childcare services, nor does it recommend one provider over another; it merely acts as a referral service.[1]
 {¶ 3} As part of its referral service, AFC runs a Home Network Program that is devoted to providing families with a connection to home care providers. The process of participating in the Home Network Program is straightforward for both parents and providers. Providers who want to be included in the referral network must complete an application indicating their level of experience, including information such as years of experience, a self-completed home safety check, a background check, any certifications and at least three personal references. On the other end, interested parents call AFC and request names of possible providers. The parents supply relevant information by answering basic intake questions, such as name, address, the number and age of children needing care, any special needs present and any preference in location.
 {¶ 4} Based on the supplied information, a computer system generates a list of providers who best match the parents' needs. AFC then provides the parents with the first four to five names on the list, along with the potential providers' contact information and tier designations.[2] AFC also sends brochures containing information about the organization, as well as tips on how to find the most appropriate care. If the parents do not find a satisfactory childcare provider from the first list, they can contact AFC to request additional names. From that point forward, AFC has no involvement in the process of choosing a suitable childcare provider. In fact, in its "Taking the Time" brochure, AFC specifically and conspicuously informs parents that:
It is your responsibility to:
• Interview, investigate, and evaluate each referral.
• Verify the quality and experience of each referral.
• Choose a caregiver and setting appropriate for your child's needs and your personal satisfaction.
Action for Children does not license, recommend, endorse,guarantee, control, or regulate any child-care resource providedthrough its referral service.
The right and responsibility for choosing childcare belongs to the family. You know your child best. Take the time and choose carefully.
(Emphasis sic.)
 {¶ 5} In early 2000, appellants began to search for someone to provide childcare services approximately three days per week for their infant daughter, Claire. After exhausting known opportunities through personal friends, appellants followed up on informational materials about AFC given to them by a friend. AFC provided appellants with an initial list of five providers, none of which proved satisfactory to Mrs. Fishpaw after she conducted phone interviews. Consequently, appellants requested and received a second list of providers, one of which was Mindy Francisco.
 {¶ 6} Appellants first met Francisco at her home for approximately one hour on a Sunday afternoon. During this initial interview, appellants and Francisco discussed topics such as scheduling, payment, the total number of children under Francisco's care, her disciplinary tactics, daily schedule of activities and Francisco's experience as an educator with Upper Arlington Schools.[3] Appellants testified that they left the interview with "a good feeling." About a week later, Mrs. Fishpaw and her mother returned to Francisco's residence to conduct a second interview during the day when children under her care were present. Appellants testified that they felt comfortable when they visited Francisco's house and were impressed by her educational experience, belief in low ratios and age-appropriate activities.[4] Appellants also testified that they were comforted by Francisco's listing as a "tier 4" provider, though they would not have made a decision to place Claire under Francisco's care without first meeting and approving of her. Appellants hired Francisco to care for Claire at the conclusion of the second interview.
 {¶ 7} On February 22, 2000, Mr. Fishpaw dropped off Claire at Francisco's home for her first day of care. When Mrs. Fishpaw picked her up that afternoon, she noticed that Claire appeared to be hungrier, thirstier and sleepier than normal. Claire also had a bruise on her forehead, which, according to Francisco, was caused by bumping into a piece of furniture. Though Claire again seemed hungry and thirsty upon being picked up on the second day, nothing else seemed unusual. On the third day, Claire had a second bruise on the opposite side of her forehead, and Francisco informed Mrs. Fishpaw that Claire's excessive crying was a problem. Appellants discussed their concerns about Claire's bruises and apparent increase in hunger, thirst and sleepiness. However, appellants concluded that Claire just needed more time to adjust.
 {¶ 8} Thus, on February 28, 2000, appellants again placed Claire with Francisco for the day. When Mrs. Fishpaw returned that afternoon, she found Claire lying face down and unable to lift her head; Claire's right hand also exhibited a tremor. After turning her over onto her back, Claire vomited, and Mrs. Fishpaw noticed that Claire's eyes were dilated. Mrs. Fishpaw instructed Francisco to call 911, and the arriving ambulance transported Claire to Children's Hospital. There, doctors determined that Claire had suffered a bilateral, subdural hematoma and retinal hemorrhaging — injuries consistent with "inflicted injury," commonly referred to as shaken baby syndrome.[5]
 {¶ 9} On May 16, 2002, appellants filed suit against both AFC and Mindy Francisco. The complaint asserted one count of negligence against both AFC and Francisco, one count of negligent misrepresentation against AFC, one count for loss of filial consortium and sought compensatory as well as punitive damages. Appellants eventually settled their claims against Francisco, who was dismissed from the action with prejudice.
 {¶ 10} On January 26, 2005, AFC filed a motion of summary judgment, arguing that it did not owe any duty to protect appellants from the criminal acts of a third party. On February 16, 2005, appellants filed a cross-motion for partial summary judgment. Appellants asserted that AFC owed appellants a duty of reasonable care in compiling its referral network and in providing names from its list of providers to interested members of the community and that AFC was liable for breaching that duty. On July 18, 2005, the trial court issued its decision granting summary judgment in favor of AFC.
 {¶ 11} Appellants filed a timely appeal with this court, raising a single assignment of error:
THE TRIAL COURT ERRED IN GRANTING APPELLEE'S MOTION FOR SUMMARY JUDGMENT AND DENYING APPELLANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
 {¶ 12} Appellate review of a trial court's decision on summary judgment is de novo. Doe v. Shaffer (2000),90 Ohio St.3d 388, 390. We must independently review the record to determine whether summary judgment was appropriate. Mergenthalv. Star Banc Corp. (1997), 122 Ohio App.3d 100, 103. Pursuant to Civ.R. 56, summary judgment is properly granted only when the record, viewed in a light most favorable to the nonmoving party, demonstrates that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Civ.R. 56(C), Temple v. Wean United, Inc. (1977),50 Ohio St.2d 317, 327.
 {¶ 13} The party moving for summary judgment bears the burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact regarding the essential elements of the claims presented. Dresher v. Burt
(1996), 75 Ohio St.3d 280, 292-293. Conclusory assertions that the nonmoving party cannot prove its case are not sufficient to discharge this initial burden. Id. at 293. Similarly, once the burden is satisfied, one cannot prevent summary judgment by merely restating unsubstantiated allegations contained within the original pleadings. Instead, the nonmoving party must demonstrate the continued existence of a genuine issue of material fact by directing the court's attention to relevant, affirmative evidence of the type listed in Civ.R. 56(C). Id., citing Civ.R. 56(E).
 {¶ 14} To successfully assert a claim of negligence, appellants must establish the fundamental elements of duty, breach of duty and injury proximately resulting from that breach of duty. Evans v. The Ohio State Univ. (1996),112 Ohio App.3d 724. To survive summary judgment, appellants must produce some evidence supporting each element. Strother v. Hutchinson
(1981), 67 Ohio St.2d 282, 285. The threshold inquiry is whether AFC owed appellants a duty of care, since "if there is no duty or obligation of care, no legal liability may arise[.]" Albright v.University of Toledo (2001), Franklin App. No. 01AP-130, citingJeffers v. Olexo (1989), 43 Ohio St.3d 140, 142. "A `duty' is an obligation imposed by law on one person to act for the benefit of another person due to the relationship between them." Id. The existence of a duty may be established by common law, statute, or by the particular facts and circumstances of a case. Douglass v.Salem Community Hosp., 153 Ohio App.3d 350, 364-365,2003-Ohio-4006, at ¶ 42, citing Eisenhuth v. Moneyhon (1954),161 Ohio St. 367, paragraph one of the syllabus. In any case, the existence of a duty is a question of law for the court. Evans,
supra, at 738.
 {¶ 15} This case turns on the issue of duty. Appellants challenge the trial court's finding that AFC owed no duty of care. Appellants assert that the trial court mistakenly interpreted their complaint to be that AFC owed them a duty to protect Claire from the acts of a third party, Mindy Francisco. Whether a defendant owes a duty to protect against the acts of a third party was addressed by the Ohio Supreme Court in Estatesof Morgan v. Fairfield Family Counseling Ctr. (1997),77 Ohio St.3d 284:
Generally, a defendant has no duty to control the violent conduct of a third person as to prevent that person from causing physical harm to another unless a "special relation" exists between the defendant and the third person or between the defendant and the other. * * *
Id., paragraph one of the syllabus. Thus, absent a special relationship between AFC and Francisco, or between AFC and appellants, AFC owed no duty to protect Claire from harm. TheMorgan court further counseled, "[i]n order for a special relation to exist between the defendant and the third person, the defendant must have the ability to control the third person's conduct." Id.
 {¶ 16} Neither party asserts that AFC had any ability to control the actions of Francisco. Accordingly, the only "special relation" that could lead to the imposition of a duty in this instance would be one between AFC and appellants. Yet, even appellants are unable to articulate how that special relation is manifested. Appellants merely submit that "[i]t could be argued that AFC did have such a duty because of the relationship created between AFC and Appellants." (Brief, at 13.)
 {¶ 17} In fact, there was no special relationship between AFC and appellants. AFC merely provided appellants with the names of approximately 10 home day care providers, names that were randomly generated by a computer program using the information given in an intake form. Once appellants had possession of those names, AFC took no part in the actual selection of a caregiver and expressly denied that it recommended one provider over any other.
 {¶ 18} AFC did not exercise any control over appellants' decision to place Claire under Francisco's care. There is no other apparent reason to stray from the general principle that there is no duty to act affirmatively for another's protection.Morgan, supra, at 293, citing 2 Restatement of the Law, Torts (1965), Section 314. With no special relation between appellants and AFC, no duty to protect against the actions of a third person arises. Where there is no duty, no actionable negligence can be found. Feichtner v. Ohio Dept. of Transp. (1995),114 Ohio App.3d 346, 357-358.
 {¶ 19} However, that is not the end of our inquiry. Appellants assert that they are not simply arguing that AFC had a duty to protect them from harm caused by third parties. Instead, appellants urge that AFC was under a common law duty to use reasonable care when placing home day care providers in its referral network and when distributing names of providers to the interested community. Appellants assert that this broader duty includes checking the providers' references, verifying the level of providers' experience, properly investigating any complaints against a provider once they are included in the network and disclosing all pertinent facts, including past complaints, to the families who use the referral network.
 {¶ 20} To illustrate the alleged common law duty, appellants propose that AFC is liable under the circumstances set forth in Restatement of the Law 2d, Torts (1965), Section 323 ("Section 323"). Section 323 outlines the imposition of liability for negligent performance of an undertaking to render services. Alternatively, appellants assert that AFC is held to a statutory duty pursuant to R.C. 2151.421.[6]
 {¶ 21} Whether argued under the common law or the statute, appellants claim that AFC was negligent in failing to properly investigate complaints and in failing to subsequently disclose information about complaints to families using the referral network. Appellants focus their argument on the existence of a prior complaint lodged against Francisco by a parent whose child was under Francisco's care. Appellants submit that if AFC had informed them of the complaint, they never would have chosen Francisco to look after Claire.
 {¶ 22} On July 22, 1999, AFC received a complaint regarding Francisco from Linda Henn, who reported that Francisco failed to cage her dogs or keep them away from children. The complaint intake form indicated that Mrs. Henn believed one of Francisco's dogs had scratched and/or bruised her child's face. Approximately three weeks previously, Francisco had called Mrs. Henn at work to tell her that her four-month-old had scratched herself during a nap. The report of Mrs. Henn's complaint continued:
However, when parent picked up child she had several bruises on her head (not terrible ones), but not something she could have done to self. Parent made an appointment with pediatrician who said it didn't appear as result of child abuse. Parent uncomfortable with inconsistent message by provider (didn't think it was abuse) and decided to terminate care.
Upon receiving the complaint, AFC placed Francisco "on hold" within the referral system.[7]
 {¶ 23} The complaint form also indicates that, at the time of the incident, Francisco spoke with "Ginny," an AFC employee. According to the notes on the complaint, Francisco's contemporaneous account of the event largely mirrored Mrs. Henn's report. After receiving Mrs. Henn's complaint, Barbara Beymer, the AFC specialist[8] assigned to Francisco, contacted her for more information. According to Beymer's notes, Francisco said that her dogs were never out when there were children at the house, and the Henn child did scratch itself badly while napping. Francisco also stated that the Henns' pediatrician had said that the scratches could have been self-inflicted by the child. Francisco concluded her account by saying that the Henns found different childcare at her suggestion.
 {¶ 24} Ms. Beymer testified that AFC did not take any further action to investigate the Henns' complaint. Given the information taken from Mrs. Henn and Francisco, the complaint was labeled a "personal dispute," and no action beyond an onsite visit and the conversations were necessary. Francisco was removed from hold status on July 27, 1999.
 {¶ 25} Appellants assert that AFC had a duty to more thoroughly investigate the incident, as well as any other parental complaint, and its failure to do so amounts to a breach of that duty. As stated above, appellants submit that the origin of that duty is found within common law principle of exercising reasonable care in performing a voluntary undertaking or, alternately, is statutorily created.
 {¶ 26} We address appellants' statutory argument first. Under R.C. 2151.421, certain people and institutions are required to report and investigate incidents of child abuse and/or neglect. R.C. 2151.421 states, in pertinent part:
No person * * * who is acting in an official or professional capacity and knows or suspects that a child under eighteen years of age or a mentally retarded, developmentally disabled, or physically impaired child under twenty-one years of age has suffered or faces a threat of suffering any physical or mental wound, injury, disability, or condition of a nature that reasonable indicates abuse or neglect of the child shall fail to immediately report that knowledge or suspicion to the entity or persons specified in this division. * * *
R.C. 2151.421(A)(1)(a). Appellants submit that AFC is subject to the mandatory reporting requirement of R.C. 2151.421 and its failure to report the Henn incident constitutes negligence per se.
 {¶ 27} R.C. 2151.421 creates a specific affirmative duty to report knowledge or suspicions of child abuse. The failure to perform that duty is actionable. Brodie v. Summit Cty. ChildrenServices Bd. (1990), 51 Ohio St.3d 112; Douglass, supra; Hitev. Brown (1995), 100 Ohio App.3d 606; Curran v. Walsh JesuitHigh School (1995), 99 Ohio App.3d 696. Appellants, as the plaintiffs, "bear the burden of showing that they fall within the class of individuals the statute was designed to protect."Douglass, at ¶ 46. In Brodie, the Ohio Supreme Court determined that "the action required by the statute is not directed at or designed to protect the public at large, but [is] intended to protect a specific child who is reported as abused or neglected." Id. at 119. Accordingly, any duty to report the Henn incident pursuant to R.C. 2151.421 was owed to the Henn child — not appellants or their daughter, Claire. Appellants' contention that AFC owed them a statutory duty under Ohio's child abuse statute is unpersuasive.[9]
 {¶ 28} Appellants' reliance on R.C. 2151.421 for the creation of a duty to investigate is also misplaced. The only duty imposed upon AFC by R.C. 2151.421 is the duty to report suspicion or knowledge of child abuse or neglect. The duty to investigate is allotted to public and human services agencies and local law enforcement:
* * * The authority and responsibility to conduct such investigations and to submit the necessary reports are vested solely in the county department of human services or the children services board, in cooperation with law enforcement agencies. * * * This responsibility may not be delegated to another agency, whether that agency be public or private.
Brodie, at 117. Thus, if AFC is held to any duty to investigate, it is not pursuant to R.C. 2151.421.
 {¶ 29} Appellants next argue that AFC is subject to the common law duty explained in Section 323. Section 323 illustrates the principle of tort law that a person has a duty to use reasonable care in the performance of an undertaking to render services, and provides as follows:
One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
(a) his failure to exercise such care increases the risk of such harm, or
(b) the harm is suffered because of the other's reliance upon the undertaking.
Appellants assert that AFC assumed a duty to them by gratuitously providing information to parents seeking childcare. Appellants submit that the requisite level of reasonable care includes investigating and verifying a providers' references and self-reported levels of experience, as well as thoroughly investigating any complaints lodged against a provider once it is part of the referral network and disclosing all discovered information to families seeking referrals. Finally, appellants contend that liability should attach because Claire suffered harm because they relied on AFC's undertaking. See Section 323(b).[10]
 {¶ 30} While the Ohio Supreme Court has recognized Section 323 and the so-called voluntary undertaking doctrine, it has not done so within the context of this case. Appellants direct our attention to several Ohio cases that discuss and apply Section 323 to varying degrees of success. However, each case cited by appellants is factually distinguishable.
 {¶ 31} For instance, in Roberts v. Ohio Permanente Med.Group, Inc. (1996), 76 Ohio St.3d 483, the Ohio Supreme Court cited the Restatement during its discussion and ultimate recognition of a "loss-of-chance" action in the field of medical malpractice. In a "loss-of-chance" case, a plaintiff is permitted to argue that the defendant physician increased the risk of harm by depriving him or her of a chance to recover or obtain suitable treatment. The concept emerges from Section 323(a), which subjects a defendant to liability when his failure to exercise due care results in an increased risk of harm. The court reaffirmed the connection between Section 323 and the "loss-of-chance" theory in McMullen v. Ohio State Univ. Hosp.
(2000), 88 Ohio St.3d 332. Courts are similarly apt to recognize and discuss Section 323 while discussing the increased risk of harm inherent to "failure to diagnose" cases.
 {¶ 32} The second category of cases in which Section 323 often surfaces involve situations in which a person, having voluntarily offered help to another individual in peril, negligently effectuates that aid. Briere v. Lathrop Co. (1970),22 Ohio St.2d 166, is one such case. In Briere, a defendant's employee had voluntarily assisted in moving the scaffolding supporting the plaintiff across the floor, which was riddled with various openings due to construction. Before the scaffolding was in a safe position, the employee walked away without warning; the scaffolding continued to move and fell through an open pit, injuring the plaintiff. The jury found "that a reasonably prudent man exercising reasonable care for the protection of others would not, under the same or similar circumstances, consider the act of voluntary assistance complete until the warning was given."Briere, at 172. In affirming the jury's verdict, the court expressed its agreement with the notion that, once undertaken, a voluntary act must be performed with due care given the circumstances.
 {¶ 33} Appellants' case presents circumstances that are dissimilar to those found in "loss-of-chance," or negligent rescue or warning, situations. A review of the case citations to Section 323 reveals few Ohio cases deviating from these two scenarios. Thus, we consider what other situations may fall within the intended parameters of Section 323.
 {¶ 34} One possible scenario is a gratuitous recommendation. In Douglass, Ohio's Seventh District Court of Appeals reversed a trial court's grant of summary judgment in favor of the defendant hospital. The Douglass court found that the plaintiffs proffered sufficient evidence to support their claim that the hospital owed a duty to warn them about a former employee based, in part, upon the voluntary undertaking doctrine. The court found that "once [the hospital] decided to give a recommendation about [the former employee], [it] was required to exercise due care in giving the recommendation." Douglass, at ¶ 75.
 {¶ 35} Here, appellants urge us to reach a similar conclusion. We decline to do so. Appellants assert that AFC had a duty to use reasonable care when placing home day care providers in its referral network. Even if we were persuaded that this claim is synonymous with a claim that AFC gratuitously recommended Francisco, the facts of this case do not support appellants' argument. AFC's literature conspicuously disavowed any intention to recommend providers, stating, in bold type, that it "does not license, recommend, endorse, guarantee, control, or regulate any child-care resource provided through its referral service." Mrs. Fishpaw stated that she read the information cover-to-cover. Moreover, Mrs. Fishpaw testified that she did not contact AFC to seek information about Francisco before hiring her:
We were told from Action For Children initially that they were a referral service. So I was under the impression that they wouldn't release any other information to us besides her name, tier, because it was her own business, that was my understanding. So I did not contact Action For Children after interviewing Mindy Francisco.
Based on the submitted evidence, it is clear that AFC did not gratuitously recommend Francisco's services to appellants. As such, we find that this case is factually distinguishable fromDouglass.
 {¶ 36} Looking to other jurisdictions for additional guidance regarding liability under the voluntary undertaking doctrine, we find that LM v. United States (2003), 344 F.3d 695, provides a useful comparison to the case at hand. In LM, the United States District Court of Appeals for the Seventh Circuit discussed the voluntary undertaking doctrine in the context of whether, by temporarily assigning a mail carrier to a desk job pending the investigation of sexual abuse allegation, the United States Post Office voluntarily undertook a duty to protect children on his daily route. Applying Illinois law, the Seventh Circuit noted that "whether a voluntary undertaking has been assumed is necessarily a fact-specific inquiry." Id. at 700. The court further observed that "a voluntary undertaking is just that — voluntary — and as such, the scope of the duty that is assumed is limited to the extent of the undertaking." Id. at 701. Ultimately, the court found the plaintiff's argument to be deficient:
LM's complaint asks us to find that the Postal Service's act of reassigning [the mail carrier] amounted to a voluntarily assumed duty to protect local children. But that act might have been motivated by a number of considerations * * * as well as for the protection of children in case the allegations turned out to be well founded.
Id. As such, the court agreed with the trial court's finding that the Postal Service had assumed no duty towards the children.
 {¶ 37} Similarly, appellants' argument necessarily assumes that AFC gratuitously undertook a duty to "render services" in the form of providing information which it "recognized as necessary for the protection of [another's] person or things." Restatement Section 323, supra. Like the plaintiffs in LM,
appellants assert that AFC's creation and implementation of a childcare referral system, including the use of different "tiers," amounts to a voluntarily assumed duty to protect children in the community. However, even if we assume that by operating a referral network AFC has voluntarily undertaken to render services, we cannot find that, in so doing, AFC voluntarily assumed a duty to protect children by providing that service.
 {¶ 38} The testimony of representatives for AFC presented various purposes and goals for the organization, none of which was the protection of children. Diane Bennett, AFC's Executive Director, testified that parents call to get information they may not have access to on their own. According to Bennett, the main function of the Home Network Program is "to educate parents in their search process." AFC's brochure states, "[a]s a child-care referral service, we provide families a connection to child-care resources." During her deposition, Barbara Beymer reiterated AFC's function as a resource only, emphasizing that it does not employ or manage the providers. AFC simply does not represent that it provides the referral network to protect children or their families.
 {¶ 39} Regardless, appellants propose that AFC assumed that duty by implementing its tier system. According to AFC's "Family Home Child Care Provider" leaflet, part of the information parents received about home providers was a tier number that "refers to the provider's level of professional development." The tiers are numbered one through four, with the level of professional development increasing respectively.
 {¶ 40} Here, appellants assert that by indicating that Francisco was a "tier 4" provider, AFC assumed a duty to ensure that Francisco appropriately qualified. Appellants submit that the duty consists of verifying all of the information Francisco provided in her application packet, including her references, and that AFC's failure to do so is an actionable breach of that duty. Again, the purpose and extent of that duty can only be interpreted to protect the children who would eventually be placed under Francisco's care. Because we agree with the Seventh Circuit's conclusions in LM, supra, we decline to adopt appellants' arguments, which seek to impose a duty that is well-beyond the scope of any obligation AFC may have assumed.
 {¶ 41} AFC did not implement the tier system in order to protect children or to insulate parents from fully investigating their own options. Diane Bennett testified that AFC began the tier program "as a way to bring more professional development to the home child care field." AFC hoped that the tier system would act as an incentive for providers to get more education, more credentialing and more experience to "move up" in the system. Eventually, AFC discovered that "it did not really serve as an incentive for them to get more training. It didn't matter." Therefore, they discontinued the program. Likewise, Betsy Loeb testified that the tier system was meant to provide parents with information, "a tool parents can use when interviewing providers to lean more about the provider in helping them to interview, make a decision."
 {¶ 42} The representatives' testimony reveals that AFC did not adopt the tier system for the benefit or protection of children. The literature AFC provided interested parents further disclaims any assumed duty to verify references or otherwise ensure that one provider is more qualified than another. The "Family Home Child Care Provider" leaflet, which exhibits the different tiers, states:
Take the time to visit several providers at different tiers before making your important decision. Quality of care provided will vary between tiers and within each tier. This system is designed to help you make a more informed choice.
"Take the Time" further stresses the importance of the parent's responsibility to "interview, investigate, and evaluate each referral" and to "verify the quality and experience of each referral." As mentioned above, AFC also conspicuously refutes any duty to account for the providers in its network:
Action for Children does not license, recommend, endorse, guarantee, control, or regulate any child-care resource provided through its referral service.
The right and responsibility for choosing childcare belongs to the family.
Accordingly, we conclude that, even assuming that AFC may have "voluntarily undertaken to render services" in the form of a referral network, it did not assume any duty to insure or protect as part of that service.
 {¶ 43} Based on the foregoing, we find that AFC owed no cognizable legal duty to appellants, regardless of which theory of negligence is applied. The law does not hold AFC to an obligation to control the conduct of a third person to prevent that person from causing harm to another absent a special relationship. No special relationship is present here. Furthermore, no duty arises under R.C. 2141.421 or under the common law principles pertaining to a voluntary undertaking exemplified by Section 323(b).
 {¶ 44} Having overruled appellants' single assignment of error, we affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
SADLER, J., concurs.
[1] Neither the providers supplying information nor the families seeking that information pay any kind of referral fee.
[2] Tier designations indicate the level of a provider's professional development and are more fully discussed below.
[3] During her deposition, Mrs. Fishpaw testified that Francisco indicated that she had 10 years of experience in special education as an early childhood educator with Upper Arlington. The veracity of Francisco's alleged statement was challenged during Mr. Fishpaw's deposition, during which he indicated that they later discovered she was only a teacher's aide for a lesser period of time.
[4] In fact, appellants felt comfortable enough with Francisco that they did not ask her whether she had experienced any difficulties with previous clients or feel the need to check her references.
[5] Mindy Francisco was later indicted and prosecuted on two counts of child endangering and one count of felonious assault. A jury found her guilty on both counts of child endangering, but did not reach a unanimous verdict on the felonious assault charge.
[6] It is not clear whether appellants adequately raised their statutory claim or argued that their theory of negligence fell under the Restatement of Torts, 2d Section 323 in the trial court. However, on appeal, appellants base their negligence claim on Section 323(b). (Appellants' brief, at 15.) Appellants have not argued that their claim is based on Section 323(a) and it does not appear from the evidence of record that a claim under Section 323(a) would be viable.
[7] While "on hold," a provider's name will not be included in any referrals.
[8] As a Home Network Specialist, Ms. Beymer was assigned to work with a group of approximately 50 providers. Ms. Beymer's responsibilities included reviewing any information contained in a provider's AFC file, periodically talking with the provider, and conducting any required visits to the provider's home.
[9] It is worth noting that there is no indication that AFC breached any duty it may have owed to the Henn child when it did not report the Henn incident pursuant to R.C. 2151.421. According to the complaint form, neither the parents nor the pediatrician believed the Henn child's injuries were intentionally inflicted as the result of abuse or neglect.
[10] Appellants' brief, at 15.
 BROWN, J., concurs in part and dissents in part.